Curtis GRAVES et al.

v.

Ben BARNES et al.

Diana REGESTER et al.

v.

Bob BULLOCK et al.

Johnny MARRIOTT et al.

v.

Preston SMITH et al.

Van Henry ARCHER

v.

Preston SMITH et al.

Frank A. ESCALANTE et al.

v.

Mark WHITE et al.

James GASKIN et al.

v.

Mark WHITE et al.

Wanda L. CHAPMAN et al.

v.

Mark W. WHITE, Jr., et al.

Civ. A. Nos. A–71–CA–142–A–71–CA–145, A–73–CA–115, A–73–CA–146 and A–73–CA–155.

United States District Court,
W. D. Texas,
Austin Division.

Feb. 19, 1976.

Don Gladden, Fort Worth, Tex., George Korbel, Mexican American Legal Defense and Educational Fund, San Antonio, Tex., for plaintiffs.

John L. Hill, Atty. Gen. by Elizabeth Levatino, Asst. Atty. Gen., Austin Tex., for defendants.

Before GOLDBERG, Circuit Judge, and JUSTICE and WOOD, District Judges.

## MEMORANDUM OPINION

### PER CURIAM:

Our second Sisyphean effort to break through the political thicket of Texas legislative redistricting ended with the hope that we had "come to a clearing, in order to observe the rays of a true democratic society." *Graves v. Barnes (Graves II)*, 378 F.Supp. 640, 663 (W.D. Tex.1974). Our hopes have been largely realized, for only one segment of the boscage remains yet to be breached.

In our original opinion, *Graves v. Barnes*, 343 F.Supp. 704 (W.D.Tex.1972), we found the multimember districting scheme in Dallas and Bexar Counties to be unconstitutional. The portion of our decision requiring single-member districts was affirmed by the Supreme Court in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). In the second decision in *Graves, supra*, in 1974, we considered eight other counties with multimember districts and one alleged to be racially gerrymandered. We there required seven of the counties in issue to be divided into single-member districts. Once again, an appeal was taken to the Supreme Court. During the pendency of the appeal, the Texas legislature enacted H.B. 1097, which provided for single-member districts in all of the counties affected by our order in *Graves II*.[1] On June 30, 1975, the Supreme Court remanded the case to us, "for reconsideration in light of the recent Texas reapportionment legislation and for dismissal if the case is or becomes moot." *White v. Regester*, 422 U.S. 935, 95 S.Ct. 2670, 45 L.Ed.2d 662 (1975).

Subsequent to the passage of H.B. 1097 by the legislature, the United States Congress extended the 1965 Voting Rights Act, bringing the State of Texas within the purview of the enactment.[2] Pursuant to Section 5 of the Act, H.B. 1097 was submitted to the Attorney General of the United States for clearance. The Attorney General, however, interposed objections to three of the districts contained within the State apportionment plan.[3] While certain recourse remains with the State, the terms of the Voting Rights Act make it clear that the provisions of H.B. 1097 to which the At-

---

1. Texas 64th Leg. H.B. 1097. Title 8, Vernon's Ann.Civ.St., Art. 195a–4.

2. 42 U.S.C. § 1973c.

3. The Attorney General's objection to the H.B. 1097 Tarrant County lines reads as follows:

    Regarding Districts 32A–32I in Tarrant County it appears that portions of the new single-member district lines are drawn through cognizable minority residential concentrations resulting in an apportionment of fragmenting of those areas into 4 districts, only one of which has a significant minority population, while fairly drawn alternative districting plans would avoid placing portions of the minority residential concentra-

tions in as many districts and would result in two districts with significant minority populations. We note that at least two of the districting alternatives presented to the Court prior to its order of January 28, 1975, in *Graves v. Barnes*, avoided the fragmenting of cognizable minority residential areas in Tarrant County that results from House Bill 1097. As we found with regard to the submitted districting in Jefferson County, the result in House Bill 1097 for Tarrant County does not appear to be necessary on the basis of natural boundaries or overriding considerations of district compactness or on the basis of any compelling governmental justification.

torney General has objected are presently ineffective.[4]

In accordance with the mandate of the Supreme Court, this court scheduled a hearing on February 9, 1976. Since the result of the Attorney General's action had been effectively to nullify the State's districting in Tarrant, Nueces, and Jefferson County, we determined that the prior multimember districts for these counties were revived, and hence the case was clearly not moot. The parties were able to resolve their differences with respect to Nueces and Jefferson Counties, and after due consideration, the court accepted the agreed order which embodied the compromise plans for these two counties. Evidence was then received regarding the present situation in Tarrant County, updating the evidence presented in *Graves II.*

■ The first issue before the court is the constitutionality *vel non* of the multimember districting plan for District 32, which constitutes most of Tarrant County. Inasmuch as the evidence presented at the last hearing revealed no basis for withdrawing from our conclusion in *Graves II* that single-member districts are constitutionally mandated for this district, *see Graves v. Barnes,* 378 F.Supp. at 644–648, we reaffirm that holding. In this regard, it should be noted that H.B. 1097 demonstrates that the State legislature has also rejected the concept of multimember districting for Tarrant County—as well as for the state as a whole.

In fashioning its relief, the court is asked to choose between two plans submitted by the parties. The plaintiffs tendered a proposal very similar to the "Escalante Plan" adopted by this court in *Graves II.* The defendants' plan, prepared by State Representative Schieffer and backed by the current Tarrant County delegation, has been presented to the court by the State Attorney General.[5] The 1970 census data supplied to the court, as well as the testimony adduced at the recent hearing in this suit, does not demonstrate that either of the two plans is unconstitutional. Both plans provide for a primary district in which minority voters constitute a clear majority. In the Escalante Plan, this district is 49.3% black and 22.2% Mexican American, while the defendants' primary district is 60.3% black and 3.8% Mexican American. In addition, each plan contains a secondary district with approximately 43% minority population. In the plaintiffs' plan, this district is 38.9% black and 3.6% Mexican American, while the defendants' equivalent district is 25.3% black and 18.2% Mexican American. An examination of each plan's tertiary and quartary minority districts

Thus, our evaluation indicates that the fragmenting of cognizable minority residential concentrations in Jefferson and Tarrant Counties will have a dilutive effect on minority voting strength, and accordingly, we are unable to conclude as we must under Section 5 that implementation of the districts 7A–7C and 32A–32I set out in House Bill 1097 for Jefferson and Tarrant Counties will not have a discriminatory effect. Under these circumstances I must, on behalf of the Attorney General, interpose an objection to the implementation of the specified districts set out in House Bill 1097 for Jefferson and Tarrant Counties.

4. Section 5 of the Voting Rights Act provides that the State may seek a declaratory judgment from the United States District Court for the District of Columbia that apportionment legislation neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color or in contravention of the guarantees set forth in Section 4(f) of the Act.

5. We note that the defendants' plan apparently does not pit any two incumbents seeking reelection against each other; hence, it is not surprising that it has the support of the Tarrant County delegation. The record indicates that three incumbents probably will not seek reelection, and this may explain the felicitous situation for the remaining representatives. In any event, the Supreme Court has said that the fact that "district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness." *Burns v. Richardson,* 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295, 16 L.Ed.2d 376, 389 (1966); cf. *White v. Weiser, supra,* 412 U.S. 783, at 791, 93 S.Ct. 2348, 37 L.Ed.2d 335.

adds little flesh to the bones of the foregoing observations. Each of the proposed plans represents a substantial improvement over the former multimember scheme with its attendant constitutional infirmities.

Aside from their assertions of dilution and fragmentation of minority voting strength, the plaintiffs argue that the court is compelled to select the Escalante Plan because the deviation factor in the defendants' plan is impermissible in a court-ordered apportionment scheme. Plaintiffs point out that while their plan deviates from absolute equality, based on 1970 census figures, by only 2.7%, the defendants' plan entails a 7.7% absolute deviation.

It would seem beyond dispute at this point that 7.7% deviation in an apportionment plan adopted by a state legislature does not violate the federal constitutional requirements of one-man, one-vote. *White v. Regester, supra* (9.9%); *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (7.83%); *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973) (16.4%).[6] The plaintiffs' argument, however, is based on the Supreme Court's holding that a court-ordered plan is held to higher standards than a legislative plan. *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). In particular, the plaintiffs' rely on the following language from *Chapman:*

We hold today that unless there are persuasive justifications, a court-ordered reapportionment plan of a state legislature must avoid use of multimember districts, and, as well, must ordinarily achieve the goal of population equality with little more than *de minimis* variation. Where important and significant state considerations rationally mandate departure from these standards, it is the reapportioning court's responsibility to articulate precisely why a plan of single-member districts with minimal population variance cannot be adopted. (Footnote omitted).

*Id.* 420 U.S. at 26, 95 S.Ct. at 766, 42 L.Ed.2d at 784.

Whether the 7.7% deviation in the defendants' plan is objectional under the *Chapman* standard is not an issue that we feel must be resolved at this time.[7] To the extent this deviation requires justification, we find such in the exigencies of time, discussed more fully below.

Further comparative analysis of these plans is frustrated by the small quantity and speculative quality of the information which has been brought to bear on the significant question of growth patterns and population movements within District 32. The 1970 census data which has been presented to the court has not been updated by any careful or substantial demographic analysis. This court is

6. The leeway afforded states in devising legislative apportionment plans is not the rule as to congressional districting, where population equality is much more strictly required. *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); *Wells v. Rockefeller,* 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969); *White v. Weiser, supra.*

7. *Chapman* teaches that if a court-ordered plan contains more than a minor deviation, the court must articulate significant state considerations to justify the departure from approximate population equality. The Supreme Court has held that, in a plan drawn by a state legislature, minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of

invidious discrimination, and that a 7.83% deviation is so minor as not to require justification. *Gaffney v. Cummings, supra.* The court in *Chapman* was confronted with a 20% deviation—which under *Mahan* would have required justification, even if it were a legislative plan. The troublesome question for another day is whether *Chapman* significantly modifies the *Mahan* standard in relation to court-ordered plans.

Another factor buttresses our decision to avoid resolution of the *Chapman* argument here—uncontradicted evidence at the hearing did indicate that a significant population decrease has occurred in plaintiffs' district 32A, which suggests that the deviation factor in their plan may well be less attractive than appears from the 1970 census figures.

unable and unwilling, on the basis of the record's conflicting and relatively inexpert testimony, to reach any final conclusions at this time on these critical questions. This court is thus unable on this record to conclude that either plan is distinctly more desirable than the other as a remedy for plaintiffs' claims.[8] However, the burden of final decision is temporarily lifted from our shoulders by compelling considerations of practicability.

At the February 9, 1976, hearing, this court heard testimony from Ms. Jerry Reynolds, the Chief Deputy in charge of voter registration in the Tarrant County Tax Assessor-Collector's office. Ms. Reynolds, the Chief Deputy in the Tarrant County Tax Assessor-Collector's office, who is in charge of voters' registration in the county. Ms. Reynolds testifed that absentee voting will soon begin for the April 3, 1976, elections, and consequently, precinct changes for Tarrant County must be completed by March 15, 1976. She further testified that, because defendants' plan follows roughly the same voting precinct lines utilized in H.B. 1097, it would be necessary to change only thirteen precinct lines, if this court adopts the defendants' plan. In contrast, implementation of the Escalante Plan would call for at least eighty-seven changes. Ms. Reynolds estimated that the latter task would require ten weeks, while the former could be accomplished in two to three weeks.

■ We cannot fail to be impressed by Ms. Reynolds' essentially uncontradicted testimony that the plaintiffs' plan cannot be implemented before the next election. For this reason, this court, as an interim measure, orders implementation of the defendants' plan for use in the 1976 elections. We hasten to add that the testimony at the recent hearing before this court contained indications that population shifts and other demographic changes may result under defendants' plan in a lessening of minority political input in Tarrant County.[9] While the present record is not sufficiently complete on this point for the court to consider taking the drastic step of postponing the elections and using the Escalante Plan, the indications alluded to do warrant the retention of jurisdiction. Cf. *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Kirkpatrick v. Preisler,* supra, note 6.

Thus, the court retains jurisdiction of this action with respect to Tarrant County for possible further consideration after the 1976 elections. Upon motion of the plaintiffs or intervenors, subsequent to the elections, that the districting plan hereby adopted does not give fully adequate relief for the constitutional deprivations suffered by the minority communities in Tarrant County, the Court will consider setting another hearing, for the purpose of granting further relief if such is warranted.

JOHN H. WOOD, Jr., District Judge (dissenting in part and concurring in part):

To that part of the majority's decision wherein it is held that the multi-member legislative districting plan for Tarrant

---

8. Neither of these plans has been approved by the legislature, and so neither is entitled to deference on the basis of its source. *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). For the present, we pretermit the thorny questions concerning the extent to which one plan might be deserving of some presumptive preference on the basis of its closer congruence to the legislatively drawn lines of H.B. 1097. *See, e. g., White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Wallace v. House,* 515 F.2d 619 (5th Cir. 1975); *Perry v. City of Opelousas,* 515 F.2d 639 (5th Cir.

1975). There are distinctions—which may or may not be controlling—between the instant situation and those in the above line of cases. We need not now determine the applicability to this case of the general principle of judicial deference to cognizable legislative policy, since its application here could only support the adoption of the defendants' plan—a result we reach, as an interim measure, on the basis of other factors.

9. The record also contains some indications that demographic changes might affect the desirability of the Escalante Plan. *See, e. g.,* note 7, *supra.*

County is unconstitutional, I respectfully dissent and reaffirm my Dissenting Opinions in *Graves I* and *Graves II.*

As was concluded in *Graves II,* supra, at pages 671–672, with respect to District 32, "the only substantiable finding that can be made is that, having full access to the political process, the minority has been relatively unsuccessful at the polls. Such lack of success is not sufficient to support a finding of invidious discrimination. See *Whitcomb v. Chavis,* supra, pages 159–160, 91 S.Ct. 1858." This conclusion remains, in my opinion, a valid one.

During the pendency of the appeal of *Graves II,* the Texas Legislature specifically undertook to abolish all multi-member legislative districts in the State of Texas, substituting in their place single-member legislative districts. (Texas 64th Leg., H.B. No. 1097). Therefore, without expressing an opinion with respect to the constitutionality vel non of the multi-member legislative districts under attack by the plaintiffs, the Supreme Court remanded the case to this Court "for reconsideration in light of the recent Texas reapportionment legislation and for dismissal if the case is or becomes moot". *White v. Regester,* 422 U.S. 935, 95 S.Ct. 2670, 45 L.Ed.2d 662 (1975). I, therefore, reaffirm my Dissenting Opinions in *Graves I* and *Graves II.*

ADOPTION OF PLAN OF DEFEND-
ANT STATE OF TEXAS

While I do not necessarily agree with the reasoning expressed herein by the majority and their Findings of Fact and Conclusions of Law, as demonstrated above and in my three prior Dissenting Opinions, I do concur with the results achieved by the decision of my learned colleagues in ordering the adoption of the plan submitted by the Attorney General of the State of Texas for holding the forthcoming legislative elections for the reasons announced by the Supreme Court in *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335, (1973).