Louis TERRAZAS, W. E. Tucker, Linda Allison Frederick, Verne D. J. Philips and Ed Emmett, Plaintiffs,

Jesus Rodriguez, et al., R. A. Deison, Jr., et al., Plaintiffs-Intervenors,

v.

William P. CLEMENTS, Individually and in his official capacity as Governor of the State of Texas; et al., Defendants.

Civ. A. No. 3–81–1946–R.

United States District Court,
N. D. Texas,
Dallas Division.

March 24, 1982.

Thomas G. Crouch, Crouch & Jones, Patricia A. Hill, Dallas, Tex., for Senate plaintiffs.

John N. McCamish, Jr., Pat Deely, McCamish, Ingram, Martin & Brown, Inc., San Antonio, Tex., for House plaintiffs.

Randall B. Strong, City Atty., Daniel R. Jackson, Asst. City Atty., Baytown, Tex., for Bayton plaintiffs.

Joaquin G. Avila, Jose Garza, Norma V. Solis, Judith A. Sanders, Mexican American Legal Defense and Educational Fund, San Antonio, Tex., Albert H. Kauffman, Dallas, Tex., Vilma S. Martinez, Morris J. Baller, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., for MALDEF intervenors.

J. Richie Field, Crews, Field, Steele & Page, Conroe, Tex., for Montgomery County intervenors.

Richard E. Gray, III, Executive Asst. Atty. Gen., State of Texas, Steve Bickerstaff, C. Robert Heath, Martha E. Smiley, Bickerstaff, Heath & Smiley, Austin, Tex., for defendants Mark White, William P. Clements, William P. Hobby, Bill Clayton, Bob Bullock, Bob Armstrong.

John Harmon, R. James George, Graves, Dougherty, Hearon & Moody, Austin, Tex., for defendant Chester R. Upham.

Bob Slagle, III, Sherman, Tex., for defendant Bob Slagle.

Cullen Smith, Larry O. Brady, Naman, Howell, Smith & Lee, David Guinn, Michael Morrison, Baylor Law School, Waco, Tex., for defendant David Dean.

William French Smith, U. S. Atty. Gen., Paul Hancock, Robert S. Berman, David S. Cunningham, III, U. S. Dept. of Justice, Washington, D. C., for amicus curiae Department of Justice.

Before RANDALL, Circuit Judge, and SANDERS and BUCHMEYER, District Judges.

PER CURIAM:

Originally, these cases presented constitutional attacks by the several plaintiffs and intervenors upon parts of the 1981 Legislative Redistricting Board's redistricting plans for the Texas Senate and House of Representatives. The consolidated cases were tried for six days, January 18–23, 1982, before a three-judge court convened pursuant to 28 U.S.C. § 2284(a). Additional hearings were held on March 1–2, 1982.

On March 5, 1982, this Court ordered temporary redistricting plans into effect with the express caveat that these temporary plans were only to remain "in effect for all elections through December 31, 1983, unless valid apportionment plans are sooner enacted." We further held that "[i]n the event that valid plans are not in effect by September 1, 1983, or such earlier date as this Court may hereafter establish, this Court will then proceed to draw permanent court-ordered plans for the apportionment of the Texas legislature."

Faced with the necessity of deciding the case by March 5, 1982, so that the scheduled May 1, 1982 primaries could be held on time, we prepared only a summary opinion to accompany our order, promising a "full opinion." We now provide that opinion, setting forth the procedural history of these cases, an analysis of the claims presented and the relief requested, our disposition of those claims and the relief granted.

## I. Procedural History of These Cases

### A. The Parties and Claims

The plaintiffs ("Senate Plaintiffs") in CA 3–81–1946–R brought suit in the United States District Court for the Northern District of Texas on October 29, 1981, against William P. Clements, Governor of the State of Texas, Mark White, Attorney General of the State of Texas, David Dean, Secretary of State of the State of Texas, Chester R. Upham, Chairman of the Republican Party of the State of Texas, and Bob Slagle, Chairman of the Democratic Party of the State of Texas, seeking declaratory and injunctive relief prohibiting implementation of the reapportionment plan for electing members of the Senate of the State of Texas adopted on October 27, 1981, by the

Legislative Redistricting Board[1] (the "LRB") of the State of Texas pursuant to Article III, § 28 of the Texas Constitution. The Senate Plaintiffs claimed, *inter alia*, that the LRB Senate plan violates the Equal Protection Clause of the fourteenth amendment and the fifteenth amendment to the United States Constitution in that it dilutes the voting strength of blacks, hispanics and republicans and ignores communities of interests throughout the State. The Senate Plaintiffs requested appointment of a three-judge court pursuant to 28 U.S.C. § 2284(a).

The plaintiffs ("House Plaintiffs") in CA 3–81–2205–R brought suit in the United States District Court for the Western District of Texas on November 6, 1981, against the same persons who were at that time the defendants in the Senate case seeking declaratory and injunctive relief prohibiting implementation of the reapportionment plan for electing members of the House of Representatives of the State of Texas adopted on October 28, 1981, by the LRB, also pursuant to Article III, § 28 of the Texas Constitution. The House Plaintiffs claimed that the LRB House plan violates the fourteenth amendment to the United States Constitution in that deviations in the proposed House districts from the ideal one person, one vote district are greater than is permitted under the fourteenth amendment; that the LRB House plan violates the fourteenth and fifteenth amendments in that the proposed House districts invidiously cancel, minimize and dilute the voting strength of racial minorities; and that the LRB House plan violates the first amendment in that it represents an intentional interference by the State of Texas with the first amendment rights of all citizens (specifically, in this case, Texas republicans) to associate politically. The House Plaintiffs also asserted that the LRB House plan impermissibly divides communities of interest and establishes districts that are not compact and contiguous. The House Plaintiffs also requested a three-judge court.

The House Plaintiffs subsequently amended their pleadings to join as additional defendants William P. Hobby, Lieutenant Governor of the State of Texas, Bill Clayton, Speaker of the House of Representatives, Bob Bullock, Comptroller of Public Accounts of the State of Texas, and Bob Armstrong, Commissioner of the General Land Office of the State of Texas (such additional defendants, together with the original defendants in the Senate and House cases, being hereinafter collectively called the "Defendants"); to seek a declaratory judgment that the LRB House plan is required to be submitted to the United States Department of Justice[2] for preclearance pursuant to Section 5 of the Voting Rights Act of 1965, as amended (the "Voting Rights Act" or the "Act"), 42 U.S.C. § 1973c,[3] or made the subject of a declara-

---

1. The Texas Constitution provides that if the legislature fails to reapportion the state legislative districts at its first regular session following each decennial census, a Legislative Redistricting Board composed of five state officers— the Lieutenant Governor, the Speaker of the House of Representatives, the Comptroller of Public Accounts, the Attorney General and the Commissioner of the General Land Office— shall meet within 90 days after adjournment of the regular session and complete the reapportionment process within sixty days of assembling, Tex.Const. art. III, § 28. For a complete discussion of the legislative process see Part IV *infra*.

2. For purposes of this opinion, the Attorney General of the United States will be referred to as the Department of Justice in order to avoid confusion with the Attorney General of the State of Texas who is a Defendant herein.

3. The relevant portion of § 1973c states:

Whenever a State or political subdivision ... shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure ... with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, that such qualifica-

tory judgment action in the United States District Court for the District of Columbia; and to seek injunctive relief ordering the Defendants to submit the LRB House plan to the Department of Justice for preclearance or to bring a declaratory judgment action as contemplated by Section 5 of the Voting Rights Act. The amended pleadings also requested a declaratory judgment that the apportionment plan for the House of Representatives in existence prior to the adoption of the LRB House plan is unconstitutional because population changes in the State since 1970 had resulted in unacceptable deviations from the one person, one vote standard. Finally, the House Plaintiffs asked the court to adopt "a legal plan of apportionment" for the Texas House of Representatives.

The City of Baytown and Emmett O. Hutto as Mayor of the City of Baytown (collectively, "Baytown") brought suit (CA–3–81–2263–R) in the United States District Court for the Western District of Texas on December 22, 1981, against the original defendants in the other cases seeking declaratory and injunctive relief prohibiting implementation of the LRB House plan. Baytown claimed, *inter alia*, that the LRB House plan violates the fourteenth amendment in that it impermissibly divides communities and units of interest existing among voting groups in this State, specifically, the City of Baytown, and that such division results from invidious purposeful discrimination; that the LRB plan "packs" certain growth districts which results in gross underrepresentation of the constituents in those areas; and that purposeful intent to discriminate in violation of the Equal Protection Clause of the fourteenth amendment is evidenced by various infirmities appearing in the LRB plan. Baytown also requested appointment of a three-judge court pursuant to 28 U.S.C. § 2284(a).

All three cases were brought directly under the fourteenth amendment and pursuant to 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. § 2201 and 28 U.S.C. § 2202. The Senate and House Plaintiffs also brought their suits pursuant to the fifteenth amendment; the House Plaintiffs' case was also brought under 28 U.S.C. § 1651 and 42 U.S.C. § 1973c. Jurisdiction for all three cases was asserted under 28 U.S.C. § 1343.

A three-judge court was designated in the Senate case. The House and Baytown cases were transferred to the United States District Court for the Northern District of Texas and consolidated on December 3, 1981 and December 30, 1981, respectively, with the Senate case for trial.

On December 16, 1981, R. A. Deison, Jr. and other individuals, all claiming residence in Montgomery County, Texas (collectively, "Montgomery County"), simultaneously moved this Court and the District Court for the Western District of Texas to allow them to intervene in the Senate case and the House case, respectively, alleging that the LRB House plan violates the fourteenth and fifteenth amendments to the United States Constitution in that it dilutes the

tion, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.
42 U.S.C. § 1973c.

voting rights of minorities, allows for greater population deviation than is permissible, intentionally seeks to reduce the voting power of republicans and impermissibly divides communities of interest. Montgomery County further alleged that the State had violated the Voting Rights Act in failing to submit the LRB plan for preclearance by the Department of Justice and that the existing plan was unconstitutional because of the extensive population changes that had taken place in Texas since 1970. Montgomery County requested that the action be maintained as a class action,[4] that this Court issue declaratory and injunctive relief and that it adopt a constitutional redistricting plan for Montgomery County. The motion to intervene was granted by this Court on January 4, 1982.

On January 6, 1982, this Court also permitted Jesus Rodriguez and other hispanic citizens (the "MALDEF Intervenors" or "MALDEF") to intervene. The MALDEF Intervenors challenged the Senate districts in Harris and Bexar Counties and District 21 in South Texas and the House districts in Bexar, Dallas, El Paso and Lubbock Counties and District 68 in Southwest Texas, as formulated by the LRB Senate and House plans, respectively, on the grounds that these districts were formed with discriminatory intent in violation of the fourteenth and fifteenth amendments. The MALDEF Intervenors also claimed that the LRB utilized racial classifications to create districts consisting of a 65% minority population, and that such benign racial classification requires strict scrutiny to assure that such a goal was not applied inconsistently as a subterfuge to discriminate against hispanic voting strength. They asserted further that racial classifications were used in a discriminatory manner and that since there is no compelling state justification, the LRB Senate and House plans are unconstitutional. Finally, the MALDEF Intervenors claimed that the districts listed above, cre-

ated by the LRB Senate and House plans, violate Section 2 of the Voting Rights Act by virtue of their discriminatory impact on hispanic voting strength, and that Section 2 does not require proof of discriminatory intent.

Shortly after the Senate case and the House case were filed, Defendants White, Dean and Clements filed motions to dismiss those cases on the ground that, under Section 5 of the Voting Rights Act, the LRB Senate and House plans were not effective until precleared by the Department of Justice and that, under *United States v. Board of Supervisors of Warren County*, 429 U.S. 642, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977), and *Connor v. Waller*, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975), the issue of the constitutionality of the plans was not justiciable until the plans were precleared. Alternatively, those Defendants requested a stay of proceedings until the plans were precleared. Recognizing that if the Department of Justice precleared the LRB Senate and House plans on a timely basis, there would not be enough time before the February 1, 1982, filing deadline for the May 1, 1982, primaries to try the cases, this Court denied the motions to dismiss or for a stay, reserving the decision until a later date, and set the cases for trial on January 18, 1982. The case was tried before the three-judge panel for six days and decision was deferred pending preclearance by the Department of Justice pursuant to Section 5.

### B. Section Five Preclearance; the Department of Justice's Objections

On January 25, 1982, two days after the close of the trial, the Department of Justice issued letters of objection to the LRB Senate and House plans under Section 5 of the Voting Rights Act. In the letter relating to each of the LRB plans, the Department concluded that "the state has failed to demonstrate that the plan is [racially and ethni-

---

4. The MALDEF Intervenors (text p. 8, *infra*) also made class allegations, but they orally withdrew those allegations at trial. Montgom-

ery County did not actively participate after their motion to intervene was granted and did not appear at trial.

cally] nondiscriminatory." [5] This conclusion is not surprising in view of the unusual, indeed unique, circumstances surrounding the State's submissions under Section 5.

On November 23, 1981, the Attorney General of the State of Texas,[6] as the State's chief legal officer and as the State officer designated by the LRB, submitted the LRB plans to the Department of Justice for Section 5 preclearance, along with extensive data to support his

> conclusion that the proposed plans will not lead to a retrogression in the position of racial and language minorities with respect to their effective exercise of the electoral franchise. The proposed plans clearly reflect minority voting strength as it currently exists and recognizes potential growth.

On November 30, 1981, the Secretary of State of the State of Texas, pursuant to a letter of designation signed by the Governor of Texas, also submitted the LRB plans for preclearance. Notably, in his submission letter the Secretary of State said:

> It has come to my attention that the submitted Plan may not comply with the Voting Rights Act in all respects. There are claims that under the Plan there is a retrogression in opportunities for minority representation. In my opinion several of these claims are meritorious.

The Secretary attached to his submission several allegations of Section 5 violations.

The Department of Justice accepted the Secretary of State's letter as Texas' official submission, and after reviewing it, found that Texas had not met its statutory burden of proving that the changes in apportionment effected by the LRB plans did not violate Section 5 of the Voting Rights Act.

Although the State of Texas had the right to provide supplemental information to the Department of Justice for the purpose of causing the objections to be withdrawn, the State initially indicated that it did not propose to do that.[7] Further, in the event that any such objection could not be satisfied on the basis of supplemental information and it became necessary to amend the LRB Senate plan or the LRB House plan, as the case may be, to meet that objection, the State was faced with the further obstacle that under Texas law there was no duly constituted body with authority to make any such amendment, at least on a timely basis. The Texas legislature, which is the body with the first responsibility for legislative redistricting, is not in session and will not meet until January 1983. The time in which the LRB can redistrict has expired. Tex.Const. art. III, § 28. Consequently, no state body currently exists for redistricting.

The net effect of the issuance by the Department of Justice of the letters of objection and the situation prevailing under Texas law was to render the redistricting of the Texas Senate and House by the LRB legally unenforceable (*Connor v. Finch*, 431 U.S. 407, 412, 97 S.Ct. 1828, 1832, 52 L.Ed.2d 465 (1977); *Connor v. Waller*, 421 U.S. at 656, 95 S.Ct. at 2003) three months before the May 1 primaries and six days before the February 1 filing deadline for those primaries.

### C. Temporary Court-Ordered Plans

Under the above circumstances, all parties to these cases asked this Court to adopt plans—some asked for permanent plans—for the redistricting of the Texas Senate and House so that the 1982 elections could be held on a timely basis. On January 28,

---

**5.** The Attorney General's letters, as they detail objections to specific districts in Texas, are fully set forth in part V, *infra*.

**6.** The current Attorney General of the State of Texas, Mark White, is a democrat; he has announced that he is a candidate for Governor of the State of Texas. The current Governor of the State of Texas, William P. Clements, is a republican and a candidate for reelection. The current Secretary of State of the State of Tex-

as, David Dean, is a republican appointed by the Governor.

**7.** The State, through both the Secretary of State and the Attorney General, eventually submitted supplemental data to and requested reconsideration of the initial objections by the Department of Justice on February 19, 1982. The objections were modified on March 4, 1982. See text p. 16, *infra*.

1982, this Court entered an order reflecting its intention to adopt temporary plans to facilitate the holding of the forthcoming elections. This Court stated that it proposed to start with the LRB Senate and House plans and to make only such modifications to those plans as would be necessary. The opinion of the Supreme Court in *McDaniel v. Sanchez*, 452 U.S. 130, 147, 101 S.Ct. 2224, 2235, 68 L.Ed.2d 724, 739 (1981), quotes a passage from the legislative history of the Voting Rights Act which seems to suggest that a court, in exigent circumstances, fashions a redistricting plan itself. But it is not possible for a court that is redistricting both houses in a State as large as the State of Texas (with a combined total of 181 districts), and that is without direct access to the computerized information that is essential to the redistricting process, to draw district lines itself in truly exigent circumstances, that is, in a period of a month. This Court had to rely on the parties to fashion alternative plans for this Court's review. This Court ordered the parties to confer and to attempt to agree on the necessary modifications to the LRB plans and to file all such modifications, agreed or contested, by February 19, 1982. Hearings on the plans were scheduled for March 1, 1982. The filing deadline for the May 1 primaries was extended from February 1 to March 19, 1982,[8] the date which, according to the Secretary of State of the State of Texas, was the last date to which the filing deadline could be extended if the primaries were to be held on time.

Finally, this Court asked the Department of Justice to appear as amicus ∙curiae to assist this Court and the parties in formulating temporary plans. The Department of Justice was also invited to participate because the letters of objection issued by that Department lacked specificity. One letter, that relating to the Texas House, simply contained a list of allegations received by the Department of Justice, many of which were vague, and concluded that on the record then before the Department, the State had not met its burden of disproving those allegations. This Court hoped that participation by the Department of Justice would enable this Court and the parties to clarify the letters of objection. The Department entered its appearance on February 11, 1982, and met with the parties informally, but it was not until March 2, 1982, by presentation in open court,[9] that the Department finally clarified, to some extent, its letters of objection.

In the response to the January 28 order, this Court received a plethora of plans. With a few exceptions, the parties made changes to the LRB plans that reflected the respective political or other objectives of the parties, rather than strictly legal concerns. Most, if not all, of the plans greatly exceeded what was necessary to meet the Department of Justice's objections and in the process significantly altered the legislative judgment embodied in the LRB plans. This Court, in reviewing the plans, became concerned about the feasibility of holding the primaries on a timely basis under most of the alternative plans submitted and instructed the parties, at a pretrial conference held on February 25, 1982, that each party must present evidence showing that the May 1 primaries could be held on time under the plan submitted by that party. This resulted in a series of last minute modifications to virtually all the submissions for the purpose of conforming the proposed plans to existing precinct lines which, in most instances, have been drawn on the basis of the LRB plans. Those changes, in turn, altered the supporting statistical data. The end result was an enormous quantity of modifications, corrections to modifications and modifications to corrections, all to be evaluated by the parties and by this Court in a period of only a few days.

On March 1–2, 1982, this Court held a hearing on the proposed alternative plans, and modifications and corrections thereto.

8. This date was subsequently changed to March 12, 1982. See note 10, *infra*.

9. A transcript of this portion of the March 1–2 hearing has been filed with the record in this case.

All parties who had participated in the January 18–23 hearing were present; pursuant to this Court's previous Order, the Secretary of State appeared and participated with his own counsel and the Department of Justice appeared, as noted above.

On March 4, 1982, only hours prior to the deadline set by this Court for releasing its decision, the Department of Justice withdrew its objections to the House districts in Harris and Lubbock Counties and District 68 in Southwest Texas. In a letter addressed to the Secretary of State, a copy of which was received by this Court on March 5, 1982, the Department of Justice preserved its objections to the LRB House plan

for Dallas, Bexar and El Paso Counties and to the LRB Senate plan for Bexar and Harris Counties. Significantly, the letter went on to state:

> In all other respects we find that the state has satisfied the burden of proof required by Section 5, in its submission of the House and Senate plan.

On March 5, 1982, this Court entered its Summary Opinion and Order adopting, as temporary court-ordered plans, the plans submitted by MALDEF on February 19, 1982, for El Paso and Bexar County House of Representatives' districts and in all other respects the LRB Senate and House plans.[10]

---

**10.** Also on March 5, 1982, this Court entered an Agreed Order Changing Texas Election Calendar Dates And Related Matters as follows:

To facilitate the holding of the May 1, 1982, primaries the following changes in the Texas Election Calendar dates and statutory requirements are ORDERED:

FOR HARRIS COUNTY ALONE

*March 7, 1982* The last date by which the State Chairman, without action of the State Executive Committee, shall certify candidates except those for the United States House of Representatives, the Texas Senate, the Texas House of Representatives, the State Board of Education, and those specific offices where filing has been extended by reason of article 13.12 and 13.12a, T.E.C.

*March 8, 1982* The respective County Chairmen shall certify and determine the order of all candidates on the ballot except those for the United States House of Representatives, the Texas Senate, the Texas House of Representatives, the State Board of Education, Precinct Chairmen and those specific offices where filing has been extended by reason of article 13.12 and 13.12a, T.E.C. This shall be done in an open meeting. The County Chairman shall file with the County Clerk a list in ballot order of the names and addresses of all such candidates no later than March 9, 1982.

*March 13, 1982* The County Executive Committees shall meet to certify and to determine lot order of those candidates not determined by lot on March 8 and to perform other duties normally performed at the March 15 statutory meeting. The Committee shall also ratify the certification of the order of the candidates as made by the County Chairmen. The County Chairmen shall file with the County Clerk a list in ballot order of the names and addresses of all such candidates no later than March 15, 1982.

If it will shorten the time necessary to prepare for the election, paper ballots may be used in conjunction with any other voting system. If the primary election can be held in Harris County without the use of paper ballots then their use shall be discretionary.

The period of time for absentee voting in person as required by article 5.05, subd. 3 T.E.C., shall be suspended and the provisions of article 5.05, subd. 4c shall apply. Absentee voting shall begin as soon as possible after the ballots become available, provided, however, that the voting shall begin no later than the tenth day before the election.

The following changes in the Texas Election Calendar shall be applicable to ALL COUNTIES STATEWIDE including Harris County except where noted:

*March 12, 1982, 6:00 p.m.* This is the FILING DEADLINE for the State Legislature and election precinct chairman candidates.

*March 13, 1982* The State Executive Committee shall meet and certify candidates and perform those duties normally performed at the March 8 statutory meeting. The Committee also shall ratify the certification of candidates for Harris County previously made by the State Chairman. The State Chairman shall immediately notify the County Executive Committee of Harris County of candidates certified for districts partially within that County.

*March 16, 1982* The County Executive Committees, except in Harris County, shall meet to certify the candidates and to determine by lot the order of candidates on the ballot and to do everything normally performed at the March 15 statutory meeting.

Last date for selection of the District Committee pursuant to article 13.18a, T.E.C.; therefore the provisions of article 13.18a are suspended insofar as they affect the date of the prescribed activity.

*March 18, 1982* Should the County Chairman not receive the list of statewide and multi-county candidates prior to the March 16 meeting, the County Chairman shall have

This Court's Summary Opinion and Order was implemented by a further order entered on March 11, 1982, specifically describing each Senate and House district and incorporating into the temporary court-ordered plans all changes in election procedures, including ballot changes, notice requirements, precinct line changes and polling station changes, necessitated by the temporary plans. Also on March 11, 1982, this Court denied the Senate and House Plaintiffs' objections to a draft of the implementing order which had been submitted by the Defendants, emphasizing "that implicit in [our] Summary Opinion and Order, and hereby made explicit, is [our] opinion that the plans which [we] adopted on March 5, 1982, are racially fair and equitable and meet all the requirements for temporary court ordered plans."

## II. Unconstitutionality of Existing Apportionment Plans

In view of the fact that the LRB Senate and House plans became legally un-

---

authority to draw order for these offices only, on Thursday, March 18 at noon at the County Courthouse in open meeting.

Last date for State Chairmen of State Executive Committee to file with the Secretary of State an itemized listing of all filing fees for the offices of State Legislature collected on applications filed for a place on the ballot; therefore Art. 13.08(e), T.E.C. is suspended insofar as it affects the date for the prescribed activity relating to the Texas legislature.

Last date for State Party Chairman to forward all filing fees collected by him or her for offices of State Legislature to the County Chairmen for the counties lying wholly or partially within each district; therefore, Article 13.08(e), T.E.C. is suspended insofar as it affects the date for conducting prescribed activities.

Last date for State Chairmen to file with Secretary of State and County Chairmen to file with County Clerk of his/her county a list in ballot order of the names and addresses of candidates for the State Legislature to appear on the primary ballot, and also the last day for each County Chairman to forward to the Chairman of the State Executive Committee a copy of each list which he or she files with the County Clerk; therefore, art. 13.12(h) is suspended insofar as it affects the date for conducting prescribed activities.

The Party Chairmen shall be required to refund filing fees to candidates for the State Legislature upon the request of the candidate to withdraw when: (1) said candidates have filed for an office prior to the effective date of a court order changing district lines, *and* (2) when the boundaries of the district for which the candidate has filed is changed by the said court orders.

The County Executive Committee may determine that notwithstanding provisions of Arts. 6 or 7, T.E.C., paper ballots may be used in conjunction with any voting system to facilitate conducting the election.

To give effect to any changes made by County Commissioner's courts to election precinct lines as a result of orders of this Court, the last sentence of Art. 13.18, subd. 2, T.E.C., is suspended until after the May primaries; and changes in precinct boundaries shall be immediately effective to alter party offices to be filed at the general primary, May 1, 1982.

When a state legislative candidate has properly filed with the state chairman or a county chairman as prescribed by article 13.-12, subdivision (c), T.E.C., and the boundaries of the district are changed by Order of this Court, no subsequent filing shall be required by that candidate to legally appear on the ballot in the primary for that district.

The provisions of article 13.12(e) are suspended for candidates for the State Legislature and election precinct chairman insofar as they allow timely application where a candidate's filing is mailed by registered or certified mail, not later than the day on which the filing deadline falls. If registered or certified mail is used, it must be received by no later than 6:00 p. m. on March 12, 1982.

As previously Ordered:

The residency qualification for prospective candidates for the Texas Legislature is suspended. *See* Tex.Const. Art. III §§ 6, 7. This suspension is applicable only if a prospective candidate does not satisfy a residency requirement as a result of changes in a district boundary line made pursuant to an order of this Court in this proceeding.

The seven day written notice requirement of Art. 2.04 subdivision 6, Texas Election Code, as amended, be and is hereby modified to provide for 24-hour written or telephonic notice.

The order adopted by this Court on February 4, 1982, prescribing certain election dates and procedures is hereby revoked. All other prior orders of this Court are amended and revoked to the extent they provide any election date or procedure differing from those prescribed herein.

For purposes of the primary election to be conducted on May 1, 1982, all provisions of the Texas Election Code are hereby suspended insofar as they are in conflict with this order.

enforceable as a result of the existence of objections to those plans by the Department of Justice under Section 5 of the Voting Rights Act, the apportionment plans for the Texas Senate and House in existence prior to the adoption by the LRB of its plans continue as the apportionment scheme in effect in Texas. *Graves v. Barnes*, 408 F.Supp. 1050, 1052 (W.D.Tex.1976). Reference is made to Part IV of this opinion for a history of the existing apportionment scheme. The Senate Plaintiffs and the House Plaintiffs claim that the existing apportionment schemes for the Texas Senate and House violate the fourteenth amendment to the United States Constitution in that deviations in the existing Senate and House districts from the ideal one person, one vote Senate and House districts, respectively, are greater than is permitted under the fourteenth amendment by *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and its progeny. We agree.

The population of the State of Texas has increased from 11,196,730 in 1970 to 14,228,-383 in 1980, representing a 27.1% increase. The population growth throughout the State has not been even. Some areas have increased more than others. The end result is wide deviations from the ideal one person, one vote Senate district (458,980) and House district (94,856) computed as a result of the 1980 census. In the Senate, the population per district varies from 354,311 to 808,063 or from 22.80% overrepresented to 76.06% underrepresented. The ratio between the largest and the smallest district is 2.28 to 1. In the House, the population per district varies from 56,290 to 253,530 or from 40.7% overrepresented to 167.3% underrepresented. The ratio between the largest and smallest district is 4.50 to 1. These large variations from substantial equality are too egregious to permit the existing apportionment schemes to be constitutionally sustained. *E.g., Gaffney v. Cummings*, 412 U.S. 735, 744, 93 S.Ct. 2321, 2326, 37 L.Ed.2d 298 (1973) (*citing Swann v. Adams*, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967) (1.30–1); *Kilgarlin v. Hill*, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967) (1.31–1); and *Whitcomb v. Chav-*

*is*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) (1.33–1), as cases of unacceptable deviations "too great to be justified by any state interest"); *Reynolds v. Sims*, 377 U.S. at 569, 84 S.Ct. at 1385. These schemes, once fair and equitable, have become archaic and outdated. *Id.* at 567, 84 S.Ct. at 1384. Population changes such as have occurred in Texas during the period from 1970 to 1980 strongly militate in favor of decennial reapportionment, as the State of Texas recognizes in Article III, § 28 of the Texas Constitution and as the State attempted to do in 1981. The existing apportionment plans are clearly unconstitutional under the one person, one vote standard of *Reynolds* and its progeny.

### III. Constitutional Challenges to LRB Plans

The Senate Plaintiffs, the House Plaintiffs, Baytown and the MALDEF Intervenors assert a variety of constitutional challenges to the LRB Senate and House plans, as follows:

1. The LRB House plan violates the fourteenth and fifteenth amendments to the U.S. Constitution in that it invidiously cancels, minimizes and dilutes the voting strength of racial minorities.

2. The LRB House plan violates the fourteenth amendment in that the population deviations from the ideal one person, one vote standard are greater than constitutionally permitted.

3. The LRB House plan represents an intentional interference by the State of Texas with the first amendment right of all citizens to associate politically.

4. The LRB Senate plan violates the fourteenth and fifteenth amendments to the U.S. Constitution in that it dilutes the voting strength of blacks, hispanics and republicans.

5. The LRB Senate plan violates the fourteenth and fifteenth amendments in that it capriciously ignores communities of interest throughout the State of Texas.

6. The LRB Senate plan violates the U.S. Constitution because it fails to contain all contiguous districts.

7. Article III, Section 25 of the Texas Constitution, which requires reapportionment be done on the basis of qualified electors, violates the Equal Protection Clause of the fourteenth amendment.[11]

8. The LRB House plan intentionally and impermissibly divides the City of Baytown, a recognizable community of interest, thereby diluting the voting strength of citizens of the community.

■ In a redistricting controversy in which the state legislative action being scrutinized by a three-judge panel is not subject to the Voting Rights Act, the role of the district court is to adjudicate the merits of claimed constitutional errors and to determine appropriate remedies for any errors found. *E.g., White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). However, when a state is subject to the Voting Rights Act, the usual disposition of claims and determination of remedies may be inapposite. In the case before us, the requirement of Texas' submission of its LRB plans for Section 5 preclearance and the resulting Department of Justice's letters of objection have injected an additional consideration into our determination of what claims we may consider and what, if any, remedies are to be ordered to prevent frustration of the Texas election system.

■ It would appear that this Court is presently foreclosed from ruling whether the claims of constitutional error in the LRB plans have any validity.

Neither ... until clearance has been obtained [for a new reapportionment plan enacted by a state] should a court address the constitutionality of the new measure.

*McDaniel v. Sanchez*, 452 U.S. at 146, 101 S.Ct. at 2234, 68 L.Ed.2d at 737, quoting *Wise v. Lipscomb*, 437 U.S. 535, 542, 98 S.Ct. 2493, 2498, 57 L.Ed.2d 411 (1978) (citations omitted). *Accord, Connor v. Finch*, 431 U.S. at 412, 97 S.Ct. at 1832 (reiterating that district court errs in considering constitutional validity of legislative act which had not been precleared); *United States v. Board of Supervisors*, 429 U.S. at 646–47, 97 S.Ct. at 835 (district court erred in determining unconstitutionality of legislative act which should have been submitted to Department of Justice for clearance); *Connor v. Waller*, 421 U.S. at 656, 95 S.Ct. at 2003 (district court erred in determining questions of constitutionality of legislative act which had not been precleared under Section 5 and was not "effective as law"). *See also*, S.Rep.No. 94–295, 94th Cong. 1st Sess. 18–19 (1975), *reprinted in* [1975] U.S.Code Cong. & Ad.News 774, 784 (district court should adjudicate constitutional issues only after Section 5 review). The stated basis for the inability of this Court to adjudicate claims of unconstitutionality of the LRB plans is that those plans, having received no Section 5 preclearance, are not "effective as law." [12] *McDaniel v. Sanchez*, 452 U.S. at 146, 101 S.Ct. at 2234, 68 L.Ed.2d at 737; *Connor v. Finch*, 431 U.S. at 412, 97 S.Ct. 1832; *Connor v. Waller*, 421 U.S. at 656, 95 S.Ct. at 2003. The LRB plans, not effective as law, are simply not before this Court for adjudication of questions of constitutionality.

Thus, we are faced with circumstances seldom before analyzed by a three-judge court, i.e., constitutional claims by plaintiffs and intervenors which cannot be adjudicated [13] due to the Department of Justice's

---

**11.** The record clearly indicates that the LRB did *not* apportion on the basis of qualified electors, as provided by Article III, Section 25 of the Texas Constitution.

**12.** Two other claims, that the LRB Senate plan violates Article III, § 25 of the Texas Constitution because it contains non-contiguous districts and that certain Senate and House districts provided for in the LRB plans violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, because they have the effect of discriminating on the basis of race, are not properly

before this Court as the LRB plans, "not effective as law," are not before us for review of those claims. *See McDaniel v. Sanchez*, 452 U.S. at 146, 101 S.Ct. at 2234, 68 L.Ed.2d at 737; *Wise v. Lipscomb*, 437 U.S. at 541, 98 S.Ct. at 2497.

**13.** We additionally find ourselves unable to adjudicate the substantive questions of violation of the Voting Rights Act, that is whether the LRB plans had the purpose or effect of abridging the right to vote, *Perkins v. Matthews*, 400 U.S. 379 at 385, 91 S.Ct. 431 at 435, 27 L.Ed.2d

objections to the LRB plans, coupled with an immediate need [14] for this Court to order

some type of principled temporary plan to prevent the frustration of the State's elec-

476; adjudication of those questions is expressly reserved to the District Court for the District of Columbia. *Id.* ("What is foreclosed to such district court is what Congress expressly reserved for consideration by the District Court for the District of Columbia or the Attorney General—the determination whether a covered change does or does not have the purpose or effect 'of denying or abridging the right to vote on account of race or color' "). Because we cannot address the Voting Rights Act questions which must be adjudicated prior to constitutional questions, *Connor v. Waller*, 421 U.S. at 656, 95 S.Ct. at 2003, we, of course, cannot address the constitutional questions. See part IV D, *infra.*

**14.** Three of the Defendants, in a motion to dismiss filed prior to trial, claimed that this Court had no jurisdiction to adjudicate questions relating to the LRB plans. Such Defendants, raising the question of ripeness, alleged that jurisdiction could not be predicated on a challenge to the constitutionality of the LRB plans as, until the plans were examined by the Department of Justice, there existed no valid Texas apportionment statutes to which a challenge could be made, citing *Connor v. Waller*, 421 U.S. at 656, 95 S.Ct. at 2003 (legislative acts required to be submitted to the Department of Justice for examination "are not and will not be effective as laws until and unless cleared pursuant to § 5 [42 U.S.C. § 1973c]"). This Court, reserving the question of jurisdiction, denied the Defendants' motion to dismiss at the pretrial conference. We now hold that we had jurisdiction initially and that that jurisdiction allows us to implement a temporary plan.

While we agree that we are unable, until preclearance by the Department of Justice, to address questions of constitutionality, this predicate of preclearance and the Department of Justice's subsequent objection to the LRB plan did not initially and does not now implicate our subject matter jurisdiction.

The original complaints, brought under 28 U.S.C. §§ 2201, 2202 and 2284(a) and 42 U.S.C. § 1973c, conferred jurisdiction upon this Court. The Plaintiffs raised the question whether the LRB plans were subject to the Act, a proper question to invoke this Court's jurisdiction. *See U. S. v. Board of Supervisors of Warren County, Mississippi*, 429 U.S. at 647, 97 S.Ct. 835.

Additionally, the Senate and House Plaintiffs, Baytown and MALDEF questioned the constitutionality of both the LRB and existing plans, again, proper questions for this Court, 28 U.S.C. § 2284(a).

When Texas submitted its LRB plans to the Department of Justice for examination in November, 1981, we were required to delay our adjudication until after preclearance. *Wise v.*

*Lipscomb*, 437 U.S. at 542, 98 S.Ct. at 2498. This delay may be described as a deferral to the Department of Justice:

> [T]he Committee's objective [is to] utilize a form of primary jurisdiction for Section 5 review under which courts dealing with voting discrimination issues should defer in the first instance to the Attorney General or to the District of Columbia District Court.

S.Rep.No.94-295, 94th Cong., 1st Sess. 18-19, *reprinted in* [1975] *U.S.Code Cong. & Ad.News* 774, 784 (emphasis added). As the court stated in *Connor v. Waller*, our inability to adjudicate constitutional claims does not necessarily mean loss of jurisdiction to order a temporary plan, if necessary.

This reversal is, however, without prejudice to the authority of the District Court, if it should become appropriate, to entertain a proceeding to require the conduct of the 1975 elections pursuant to a court-ordered reapportionment plan that complies with this Court's decisions in *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Connor v. Williams*, 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704 (1972); and *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975).

421 U.S. at 656-57, 95 S.Ct. at 2003.

The ability of this Court to retain jurisdiction and act to draw temporary plans in the face of submission of the LRB plans to the Department of Justice is further supported by language from *Wise.*

> Pending such submission and clearance, if a State's electoral processes are not to be completely frustrated, federal courts will at times necessarily be drawn further into the reapportionment process and required to devise and implement their own plans.

*Wise v. Lipscomb*, 437 U.S. at 542, 98 S.Ct. 2498.

Thus, as the district courts in *Connor v. Waller* and *Wise v. Lipscomb* had the authority to act after examination by the Department of Justice, so, it seems, our jurisdiction remained even after a primary objection by the Department of Justice to the LRB plan. Thus, in light of applicable precedent, it seems clear that we initially were faced with an Article III case or controversy which invested this Court with subject matter jurisdiction. Additionally, as *Waller* and *Wise* indicate, our jurisdiction did not dissolve because of the requirements of Department of Justice preclearance; while we have no authority to adjudicate the substantive constitutional and voting rights claims relevant to the LRB plans, our initial Article III jurisdiction and the current exigencies faced by this Court in assuring that the Texas election process will not be frustrated, *Wise v. Lipscomb, supra*, are the bases for our authority to act.

Legislative bodies should not leave their reapportionment tasks to the federal courts;

toral system. Our task is to devise a remedy but without having adjudicated a violation on which to predicate that remedy.

It is in that context in which we turn to the issues before us: what principles should be followed in implementing a temporary plan, what plan or plans may and can be implemented in order for the elections to take place, and what value judgments should be made concerning the plans we order into effect. We address these issues in light of the general principles applicable to temporary court-ordered plans.

## IV. Principles Applicable to Temporary Court-Ordered Plans

### A. Necessity for Timely Elections

■ This Court strongly believes and so finds from the evidence presented that it is important to the people of this State that the May 1 primaries be held and that they be held on time. We understood that all parties and the Department of Justice, as amicus curiae, agreed. If the May 1 primaries are not held, there will continue in office Senators and Representatives elected from many districts that, as a result of the population increase in this State during the past ten years, have become severely malapportioned under the one person, one vote principles of *Reynolds v. Sims, supra*, and its progeny. If the primaries are postponed to a date different from May 1, when elections are scheduled to be held, the resulting low voter turnout will have a materially adverse impact on minorities and others (such as those running against incumbents) who are depending on a high voter turnout for success at the polls. Finally, testimony at trial indicates that it will cost at least $7,000,000 to hold the May 1 primaries and run-offs, and a decision to hold the primaries for the Texas Senate and House on a different date from the other elections would result in substantial additional ex-

pense. This necessity for timely elections requires us to draw temporary plans.

### B. Temporary Versus Permanent Court-Ordered Plans

■ This Court's decisions to adopt temporary plans and, in so doing, to begin with the LRB plans are based on several considerations, some legal and some practical. We recognize that legislative reapportionment is primarily the duty and responsibility of the State legislature or other body, rather than that of a federal court. *Reynolds v. Sims*, 377 U.S. at 587, 84 S.Ct. at 1394; *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975). Reapportionment is a legislative task which the federal courts should make every effort not to preempt. *Wise v. Lipscomb*, 437 U.S. at 539, 98 S.Ct. at 2496; *Connor v. Finch*, 431 U.S. at 414–15, 97 S.Ct. at 1833–34. The Supreme Court has emphasized that when a federal court declares an existing apportionment scheme unconstitutional, it is appropriate to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan. *Wise v. Lipscomb*, 437 U.S. at 540, 98 S.Ct. at 2497; *Burns v. Richardson*, 384 U.S. 73, 85, 86 S.Ct. 1286, 1293, 16 L.Ed.2d 376 (1966). Judicial relief in the form of a permanent court-ordered plan becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an opportunity to do so. *Wise v. Lipscomb*, 437 U.S. at 540, 98 S.Ct. at 2497; *Connor v. Finch*, 431 U.S. at 415, 97 S.Ct. at 1834; *Reynolds v. Sims*, 377 U.S. at 586, 84 S.Ct. at 1394.

Applying the same principles, the legislature should be given an opportunity to respond when the Department of Justice interposes an objection under Section 5, and

---

but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the "unwelcome obligation," *Connor v. Finch, supra*, at 415, 97 S.Ct.

at 1834, of the federal court to devise and impose a reapportionment plan pending later legislative action.
*Wise v. Lipscomb,* 437 U.S. at 540, 98 S.Ct. at 2497.

the Texas legislature has not had that opportunity. The record is devoid of any evidence to indicate that the State is, or would be in the future, unresponsive to Voting Rights Act objections if a mechanism were in existence under State law to enable the State to respond on a timely basis. These considerations argue strongly in favor of adopting temporary plans to facilitate the holding of the 1982 elections and giving the new legislature an opportunity to address the Voting Rights Act problems, if any, whether in the context of plans similar to the LRB plans or otherwise.

### C. Adherence to Legislative Plans

 This Court also recognizes that a district court errs if it brushes aside state apportionment policy without solid constitutional or equitable grounds for doing so. *White v. Weiser*, 412 U.S. 783, 796, 93 S.Ct. 2348, 2355, 37 L.Ed.2d 335 (1973); *Whitcomb v. Chavis*, 403 U.S. at 161, 91 S.Ct. at 1878 (1971). In choosing among plans for implementation, a court should select the plan most nearly adhering to the district configurations in the State's enactment to the extent that such adherence does not detract from constitutional requirements.

> [A] federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution[.] ...

*White v. Weiser*, 412 U.S. at 795, 93 S.Ct. at 2354. When fashioning a temporary plan, a district court should not preempt the legislative task nor "intrude upon state policy any more than necessary." *Whitcomb v. Chavis*, 403 U.S. at 160, 91 S.Ct. at 1877.

These considerations militate strongly in favor of fashioning temporary plans which have, as their core, the LRB plans, to the maximum extent possible. Our review of the record as it reflects the development of the LRB plans clearly demonstrates that those plans, which were derived from the plans adopted by the legislature, are the result of a legislative process which we should recognize as an expression of legitimate legislative activity.

### 1. Genesis of the LRB Plans

In view of the fact that the Senate and House Plaintiffs challenge the appropriateness of deference to the LRB plans as the product of legislative activity, we think it useful to set forth the genesis of those plans in some detail. We begin by noting that it is not possible to understand the effort which went into the development of the 1981 redistricting plans by the Texas legislature, which, in turn, is reflected in the LRB plans, without understanding the fate which befell the predecessors of the 1981 effort.

In 1951, *for the first time in twenty-nine years,* the Texas legislature reapportioned the Senate and the House of Representatives.[15] In 1961, and again in 1971, legislative apportionment bills were passed in the first regular session following the decennial census—but the State spent most of the decade of the 1960's and almost all of the decade of the 1970's in prolonged and costly litigation concerning the validity of its Senate and Representative districts and its congressional districts.[16]

### a. Political Thicket I: The 1960's

Soon after the 1962 Supreme Court decision in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), suits attacking

**15.** The Texas Constitution requires the legislature to reapportion the 31 Senate and 150 House districts at the first regular session following each decennial census. Tex.Const. art. III, § 28. *See*, S. Bickerstaff, "Reapportionment by State Legislatures: A Guide to the 1980's," 34 Sw.L.J. 607 (1980). If the legislature fails to reapportion the state legislative districts at its first regular session, the LRB has

the Texas constitutional responsibility for reapportionment. Tex.Const. art. III, § 28. See note 1, *supra*.

**16.** *E.g., Smith v. Craddick,* 471 S.W.2d 375 (Tex.1971); *Bush v. Martin,* 251 F.Supp. 484 (S.D.Tex.1966). *See*, Bickerstaff, *Reapportionment* at pp. 622–25.

the 1961 State legislative and congressional redistricting plans were filed in federal district courts in Texas.

In 1963, the congressional redistricting plan, which had been enacted in 1957, was held unconstitutional. *Bush v. Martin (Bush I)*, 224 F.Supp. 499, 509 (S.D.Tex. 1963), *aff'd per curiam*, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964). However, in view of the exigencies of time, the district court permitted the 1964 congressional elections to be conducted under the unconstitutional 1957 legislation. *Bush v. Martin (Bush II)*, 251 F.Supp. 484, 490 (S.D.Tex. 1966). Then, in 1965, the same district court held that the 1961 State Senate and House districts were unconstitutional. *Kilgarlin v. Martin*, 252 F.Supp. 404, 456 (S.D. Tex.1966). The State did not appeal.

With the 1961 redistricting plans completely invalidated, the legislature created new legislative and congressional districts in 1965. The congressional districts, promptly attacked upon complaints that they contained excessive population deviations and discriminated against cities, the Gulf Coast and the republican party, were upheld as a "substantial good faith effort [by Texas] toward the constitutional goal of population equality." *Bush II* at 484.

The House redistricting plan (but not the Senate plan) was also attacked in district court, and in February of 1966, the court held that part of the plan (providing for flotorial districts) was unconstitutional. *Kilgarlin v. Martin, supra.* On appeal, the Supreme Court held that the entire plan was unconstitutional because of population deviations—although the Court affirmed the decision of the district court denying the claims of racial and political dilution and gerrymandering. *Kilgarlin v. Hill*, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). Because the district court allowed the legislature until 1967 to correct the House districts, the 1966 elections were conducted under the unconstitutional 1965 redistricting plan. New House districts were drawn by the legislature in 1967 and were amended in 1969 to eliminate the more egregious population disparities.

### b. Political Thicket II: The 1970's

In its first regular session after the 1970 census, the legislature drew new districts for the House of Representatives, but did not pass redistricting plans for the State Senate or the Texas congressional districts. A special session resulted in a congressional redistricting bill. The LRB was required to redistrict [17] the State Senate, and subsequently, the House of Representatives, after State courts held that the House redistricting plan was invalid under the Texas Constitution because it violated the requirement for preserving counties intact. *Smith v. Craddick*, 471 S.W.2d 375 (Tex.1971).[18]

One day after the LRB completed its tasks, the first of four suits attacking both the Senate and House redistricting plans were filed. After the cases were consolidated for trial, the Senate redistricting plan was upheld by the district court, and the Supreme Court affirmed. *Graves v. Barnes (Graves I)*; 343 F.Supp. 704 (W.D.Tex. 1972), *aff'd sub nom, Archer v. Smith*, 409 U.S. 808, 93 S.Ct. 62, 34 L.Ed.2d 68 (1972). In 1972, the House redistricting plan was held unconstitutional because of excessive population deviation and because black and hispanic voting strength was diluted by certain multi-member districts. In *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Supreme Court reversed in part and held that the 9.9% maximum population deviation of the representative districts was *not* unconstitutional. The district court's findings invalidating multi-member districts were affirmed, *id.*, and the multi-member districts were involved in subsequent litigation until, in 1975, the Texas legislature provided for single-member districts for all 150 seats. By this time, Texas was subject to the Voting Rights Act, and the Department of Justice

---

17. See note 1, *supra*.

18. Initially, the LRB refused to redraw the Representative districts. However, a subsequent decision by the Texas Supreme Court held that the LRB had a duty to apportion not only the Texas Senate, but also the Texas House of Representatives, after the legislative enactment was declared invalid. *Mauzy v. Legislative Redistricting Board*, 471 S.W.2d 570 (Tex.1971).

objected to several of the new single-member districts. These objections were resolved after still more litigation, *Graves v. Barnes (Graves II)*, 378 F.Supp. 640 (W.D. Tex.1974), *aff'd sub nom, Briscoe v. Escalante*, 435 U.S. 901, 98 S.Ct. 1444, 55 L.Ed.2d 492 (1978). By the spring of 1978, the House districts were established.

The congressional districts were held unconstitutional in 1972 because of excessive population deviation, and the district court adopted one of several alternative plans offered by the parties. This decision was stayed by the Supreme Court, *Bullock v. Weiser*, 404 U.S. 1065, 92 S.Ct. 750, 30 L.Ed.2d 752 (1972), and the 1972 congressional elections were held under the unconstitutional districts. In 1973, the Supreme Court affirmed the district court's conclusion held that the congressional redistricting was unconstitutional, but held that the district court had selected the wrong plan from the alternatives submitted to it because it had not selected the plan which most closely adhered to the "desires of the state legislature." *White v. Weiser*, 412 U.S. at 795, 93 S.Ct. at 2354. On remand, the district court adopted a plan consistent with the Supreme Court's opinion—and this congressional plan was, in essence, codified by the legislature in 1975.

### c. The 1980's: Political Thicket III?

It was against this background—this history of prolonged, expensive and confusing litigation during two prior decades—that preparation for the 1981 redistricting began almost two years in advance.

This preparation was elaborate; it was expensive; and it was comprehensive. The Texas Legislative Council,[19] committees of both the Texas Senate and House of Representatives, and members of the LRB were involved.

### i. Pre-Session Preparation

Representatives of the Texas Legislative Council prepared for redistricting by meeting with officials of the Bureau of Census and of the Department of Justice and by hiring Steve Bickerstaff, an attorney who had represented the State of Texas in prior redistricting litigation, to prepare a comprehensive review of the laws concerning redistricting. Bickerstaff's comprehensive review—which was published as a law review article[20]—was distributed to all members of the state legislature and to all members of the Texas congressional delegation. It became, in the words of several witnesses, "the bible of redistricting" in the legislative session and before the LRB.

The Bickerstaff review analyzed the legal principles concerning redistricting—under the United States Constitution, the applicable state laws, and Section 5 of the Voting Rights Act—particularly in light of the "litigious experience of the State of Texas over the past two decades." It made specific recommendations as to the conduct of the process.[21]

Following Bickerstaff's recommendations, the Texas legislature conducted well publicized public hearings throughout the State before the legislative session began to

---

**19.** The Lieutenant Governor, William P. Hobby, was Chairman of the Texas Legislative Council; the Speaker of the House of Representatives, Bill Clayton, was Vice-Chairman.

**20.** S. Bickerstaff, "Reapportionment by State Legislatures: A Guideline to the 1980's," 34 Sw.L.J. 607 (1980).

**21.** Bickerstaff recommended: that public hearings be held not only during the legislative session, but also before, at locations across the state "to allow access to people who could not attend hearings at the state capital during the session;" that legal studies concerning applicable state and federal standards for reapportionment be prepared and distributed among the legislators; that a "special effort should be

made to assure that the legislative process itself is fair and provides for equal access by all interests;" and that minority groups be assured access by including among the members of any committee considering reapportionment matters "persons who are representatives of the state's diverse geographical and economic interests and who are members of the major identifiable electoral minorities or are known to be sensitive to the needs and interests of those minority groups." Bickerstaff, *Reapportionment*, pp. 680–83. The Bickerstaff review concluded with "these final guidelines" to assist the Texas legislature in the redistricting process:

(1) Each state must make a good faith effort to construct legislative and congressional

allow access to persons or groups who might not be able to attend hearings in Austin. The witnesses at these hearings included representatives of various geographic, economic and minority interests.

### ii. The Senate

After the Texas legislature convened on January 3, 1981, the Senate adopted a "unique procedure" which assured equal access by all interests: all redistricting bills were referred to a Committee of the Senate Sitting as a Whole. This procedure permitted the consideration of every redistricting bill by every member of the Senate.

An hispanic Senator, Tati Santiesteban, of El Paso, who had been a member of the Senate since 1972, was appointed as Chairman of the Senate Sitting as a Whole.

The Senate held public hearings not only in Austin, but also at seven locations around the State, to afford access to as many people as possible. Testimony and alternative plans were presented by more than 35 representatives of minority groups.[22] In addition to summaries of the testimony at the public hearings, members of the Senate considered Bickerstaff's legal study and advice from other lawyers, including Jerris Leonard, former head of the

districts of as nearly equal population as is practicable.

(2) State constitutions, while subordinate to federal law, can impose requirements that unless followed will invalidate a state legislative or congressional reapportionment. In Texas, the house of representatives must be apportioned among the state's counties except as otherwise necessary to comply with federal law.

(3) A state may consider legitimate factors other than population in reapportionment if these factors produce only minor variations from population equality and can be shown to result from the effectuation of a rational state policy. The standard of equality in population applicable to congressional districts is stricter than the one applicable to state legislative districts.

(4) A state may not reapportion so as to invidiously minimize or cancel the voting strength of racial or political elements.

(5) Before any reapportionment may take effect, a state subject to section 5 of the Voting Rights Act must carry the burden of proving to the United States Attorney General or the District Court of the District of Columbia that the reapportionment has neither the purpose nor the effect of denying or abridging the right to vote on account of race or color. Preparation for carrying this burden must begin long before the reapportionment itself is enacted.

(6) A state subject to section 5 of the Voting Rights Act must draw districts that contain sufficient voting age population of the protected racial minority so as to avoid a retrogression in the position of that minority in its ability to elect candidates of its choice.

(7) Precautions through special rules or procedures should be taken to assure that the legislative process itself remains fair and allows sufficient opportunity for access by the general public and the diverse interest groups affected by reapportionment.

(8) Each state legislature should provide for legislative participation in the submission of the reapportionment enactment to the required federal authorities, if the state is subject to section 5 of the Voting Rights Act, and in any litigation concerning the reapportionment.

(9) Each state legislature should adopt objectively verifiable criteria to be utilized during the reapportionment process and must carefully establish and document as part of the legislative record the basis for deviations of a certain degree from the constitutional norm of population equality or the presence of characteristics of districting that can have the effect of diluting the voting strength of minority groups.

Bickerstaff, *Reapportionment*, pp. 685–86.

22. Following is a list of the representatives of minority groups who testified or presented plans in connection with the adoption by the Senate of a redistricting plan:

| hearing site and date | witness | group or issue |
| --- | --- | --- |
| Corpus Christi 4-9-81 | Tony Bonilla | LULAC |
| | Rudy Garza | minority representation |
| | Benny Benavides | minority representation |
| | Prof. Fredrick A. Cervantes | minority representation |
| | Dr. Clotilde Garcia | minority representation |

| hearing site and date | witness | group or issue |
|---|---|---|
| Corpus Christi 4-9-81 | Alonzo Rodriquez | minority representation |
| | Robert Aguilar | minority representation |
| | Dr. Maria Garza | Exec. Director, Gulf Coast Council of La Raza |
| Fort Worth 4-23-81 | Devoyd Jennings | NAACP; and Ft. Worth Minority Leadership and Citizens Council ("Minority Leadership Council") |
| | Clifford Davis | Black Lawyers of Ft. Worth |
| Dallas 4-23-81 | John W. Price | Coalition for Minority Representation ("Coalition") |
| | J. B. Jackson | Frederick W. Douglas Voting Council; black representation |
| | Elsie Fay Heggins | black city council member |
| | Jesse Jones | Progressive Voters League; black representation |
| | Ziggy Hunter | minority representation |
| | Sim Stokes | Coalition; Chair, Black Republican Council of Dallas |
| | Bill Forrest | black representation |
| | Paul Rivers | black representation |
| Houston 4-24-81 | Sharon Lorenzo | minority representation |
| | Doris Hubbard | minority representation; resident of Acres Homes area |
| | Rev. F. N. Williams | Houston Baptist Pastors and Ministers Fellowship; minority representation |
| | Dr. C. L. Washington | Southeast Improvement Assc.; minority representaton |
| | Howard Middleton | Chair, Harris County Council of Organizations (a coalition of 91 black organizations) |
| Austin 4-28-81 | Joaquin Avila | MALDEF, Texas Rural Legal Aid ("TRLA"), and Southwest Voter Registration Education Project ("SVREP") |
| | Choko Gonzalez Meza | SVREP |
| Austin 5-16-81 | Jesse Gaines | Ft. Worth-Tarrant County NAACP ("Tarrant NAACP") |
| | Doris Hubbard | black representation |
| | Robert Palmer | minority representation |
| | Lucy Patterson | Coalition |
| | William Forest | Coalition; Frederick Douglas Voting Council |
| | Howard Middleton | Harris County Council of Organizations; black representation |
| | Paula Brown | Coalition |
| | Sim Stokes | Coalition |
| | Michael Walker | Coalition |
| | Joaquin Avila | MALDEF |
| | Al Lipscomb | Coalition |
| | Jesse Jones | Dallas Progressive Voters League |

Civil Rights Division of the Department of Justice, who acted as counsel to one Senate subcommittee. The initial plans drafted by the Senate staff were circulated statewide.

The final plan, Senate Bill 800 ("S.B. 800"), passed by a vote of 23–7 on May 30, 1981. All minority members of the Texas Senate voted in favor of S.B. 800. Three republican members of the Texas Senate voted in favor of S.B. 800. Four republican Senators voted against it.

On June 1, 1981, the Texas legislature adjourned. On June 18, 1981, S.B. 800 was vetoed by Governor William P. Clements.

#### · iii. The House of Representatives

In the House, redistricting was the responsibility of the Committee on Regions, Compacts and Districts. The Chairman of this Committee was Representative Tim Von Dohlen. The Vice Chairman of this Committee was an hispanic Representative from El Paso, Robert Valles. Among the 19 other members were one hispanic, three blacks and two republicans.

Nineteen public hearings were held in Austin during the spring of 1981. Literally scores of representatives of minority groups testified at those hearings. Public hearings were also held in Corpus Christi, Lubbock, Midland, McAllen, San Antonio, Houston, Beaumont, Fort Worth, Dallas, El Paso, and Belton. Representatives of minority groups spoke at every hearing outside of Austin,[23] with the single exception of Midland. At some of those hearings, half of the witness-

**23.** Following is a list of the representatives of minority groups who testified or presented plans in connection with the adoption by the House of a redistricting plan:

| hearing site and date | witness | group or issue |
| --- | --- | --- |
| Corpus Christi 9–10–80 | Ruben Bonilla | LULAC |
| Lubbock 9–16–80 | Sister Regina Foppe | hispanic representation |
| McAllen 9–24–80 | Joe Sanchez | Mayor of Weslaco |
| San Antonio 10–1–80 | Ray Ramirez | LULAC |
| | Rolando Rios | SVREP |
| | Choco Gonzalez | SVREP |
| | Maria Berriozabal | Mex. Am. Business and Professional Women's Club of San Antonio |
| Houston 10–7–80 | Beulah Shepard | Acres Homes, Studewood; black representation |
| | Johnny Mata | LULAC |
| Beaumont 10–22–80 | Richardo Ramirez | LULAC |
| Ft. Worth 11–18–80 | Paul Geisel | Professor of Urban Affairs, U. Tex. at Arlington; minority representation |
| | Leonard Chaires | LULAC |
| | Gwendolyn Morrison | Ft. Worth Black Chamber of Commerce |
| | Don Gladden | minority representation |
| | Jesse L. Gaines | Tarrant NAACP |
| | Sam Garcia | hispanic representation |
| Dallas 11–19–80 | Rev. S. M. Wright | President Interdenominational Ministers Alliance of Dallas; minority representation |
| | Leonard Chaires | LULAC |
| | Sim Stokes | Chair, Coalition |

es who testified represented minority groups such as the NAACP, LULAC and others. For example, eight of seventeen witnesses at the Dallas hearings held on November 19, 1980, represented minority groups. Further, nearly every other witness, from groups such as the Dallas republican or democratic party, addressed the issues of minority districts and packing. In addition to summaries of the testimony at the hearings, Bickerstaff's legal study and other legal advice were available to all members of the House.

Of the numerous alternatives, the final plan which emerged was House Bill 960 ("H.B. 960"). The vote was 118 to 22. However, H.B. 960 was declared invalid by the Supreme Court of Texas on August 31, 1981, because it violated Article III, § 26 of the Texas Constitution. *Clements v. Valles,* 620 S.W.2d 112 (Tex.1981).

### iv. LRB Activities

Because of the veto of S.B. 800 and the Texas Supreme Court's invalidation of H.B. 960, the LRB assembled in Austin on August 30, 1981, the ninetieth day following the adjournment of the regular session of the Legislature, to draw redistricting plans.[24]

There were no minority or republican members of the LRB; each of the five members was an anglo democrat.

The procedures adopted by the LRB at its first meeting were designed to assure fair and equal access by all interests; all meetings were open; no action was taken in closed session. Formal public notice was given of each meeting, and there was extensive newspaper coverage of the activities and proposals of the LRB. Plans being considered by the LRB were circulated to a mailing list of approximately 700 interested persons and were also widely distributed among members of the press and the public. At each hearing and meeting of the LRB, an opportunity was afforded for persons to testify or comment on matters being considered by the LRB. The LRB heard testimony and accepted reapportionment plans submitted by various individuals on the 24th and 25th of September and on the

| hearing site and date | witness | group or issue |
|---|---|---|
| Dallas 11–19–80 | Richard Dockery | NAACP |
| | Chris Brown | Minority Business Community; black representation |
| | John Price | Chair, Dallas County Progressive Voters League; black registration |
| | Carolyn I. Wright | Coalition |
| | Calvin W. Stephens | President, Dallas Minority Business Center; black representation |
| El Paso 12–4–80 | Jarvier Bonales | LULAC |
| Belton 12–18–80 | Vera Sutton | minority representation |
| | Antonio Pena | LULAC, Waco |

24. The LRB, originally required to redistrict only the Senate after Governor Clements' veto of S.B. 800, on June 18, 1981, delayed assembling until the last possible (90th) day allowed by the Constitution in order to reserve as much time as possible should the Texas Supreme Court declare the House plan unconstitutional. This decision to delay was prudential as the House plan was invalidated on August 31, 1981. If the LRB had assembled immediately after the veto, on June 19, 1981, its constitutional life of 60 days would have expired on August 19, 1981, and, it would have been required to disband, unable to redistrict the House subsequent to the Texas Supreme Court's decision on August 31, 1981. See note 1, *supra,* for information with respect to the composition of the LRB.

25th, 26th, 27th and 28th of October.[25] The record of all public hearings before the Texas legislature was made a part of the record of the LRB.

Lieutenant Governor Hobby proposed a Senate plan for the LRB ("the Hobby Plan"), which was based upon S.B. 800, but which made certain modifications in Tarrant, Dallas, Harris, and Bexar Counties and in District 2 in East Texas and District 27 in South Texas. At the final session of the LRB on October 28, 1981, the Hobby Plan was adopted by a 4–1 vote (with Comptroller Bullock dissenting).

**25.** Following is a list of the representatives of minority groups who testified or presented plans in connection with the adoption of the LRB plans:

| hearing date | witness | area; group or issue |
|---|---|---|
| September 24–25, 1981 | Joaquin Avila | MALDEF |
| | Raul Noriega | El Paso; TRLA; hispanic representation |
| | Margie Vallez | El Paso; Northeast Civic Leaders Council; hispanic representation |
| | Bruce Barrick and Craig Murphy | Dallas; LULAC; Mex. Am. Republicans; Mex. Am. Democrats |
| | Rep. Paul Moreno | El Paso; Chairman Mex. Am. Legislative Caucus |
| | Jamie Gandara | El Paso; El Concilio (the council of 26 hispanic organizations including: G.I. Forum; Chicano Faculty Assc. of U.T.E.P.; El Paso Women's Political Caucus; Farmer Workers Support Committee; LULAC; Lower Valley Civil Assc.; Mex. Am. Bar Assc.; Mex. Am. Democrats; Pan American Chamber of Commerce; Project BRAVO) |
| | Rep. Matt Garcia | Bexar County, hispanic representation |
| | John Wiley Price | Dallas; Coalition; black representation |
| | Roy Ontiveros | Dallas; minority representation |
| | Jesse Gaines | Tarrant NAACP; Minority Leadership Council |
| | Charles Rose | Dallas; Coalition |
| | Al Lipscomb | Dallas; black representation |
| | Eustolio Gonzalez | County Commissioner Willacy County |
| | Joe Rodriguez | hispanic community of interest in "the Valley;" existing Senate District 20 ("The Valley") |
| | Fred Hernandez | "The Valley" |
| | Jimmy Martinez | "The Valley" |
| | Joe Zapata | "The Valley" |
| | Alonzo Rodriguez | "The Valley" |
| | Humberto C. Saenz, Jr. | "The Valley" |
| | George Korbel | TRLA |
| October 25–28, 1981 | Raul Noriega | TRLA |
| | George Korbel | TRLA |
| | Rep. Paul Ragsdale | Dallas; black and hispanic representation |
| | Rep. Bob Valles | El Paso; hispanic representation |

Speaker Clayton proposed a House plan for the LRB ("Clayton Plan"), which was based in large part upon H.B. 960. At the final session of the LRB on October 28, 1981, Land Commissioner Armstrong proposed amendments for Bexar, Dallas and Harris Counties which were supported by minority interests. With these amend-ments, the Clayton Plan was adopted by a 4–1 vote (with Comptroller Bullock dissenting).

The LRB accepted much of the testimony and adopted many proposals offered by representatives of minority groups and minority legislators, both with respect to the Senate[26] and the House.[27]

26. Following is a summary of some of the major proposals considered and adopted by the LRB for the Senate plan:

(i) The Senate redistricting plan adopted by the LRB creates three districts that are almost identical to those submitted by MALDEF and TRLA.

(ii) TARRANT COUNTY: S.B. 800 did not pair either of the republican Senators from Tarrant County, but it maintained the division of the minority community in Fort Worth. After the session, one of these Senators (Andujar) announced she would not seek re-election. Jesse L. Gaines, testifying on behalf of the Ft. Worth-Tarrant County Chapter of the NAACP and the Fort Worth Minority Leaders and Citizenship Council, asked the LRB to eliminate the division of the black community. Responding to this testimony, the LRB plan combined the minority community in district 12, which closely conforms to the city limits of Fort Worth and which created an impact district.

(iii) ELECTIONS: Mr. Jim George, who claimed to speak on behalf of the republican party, asked that the Board reapportion the Senate on the basis of qualified electors in accordance with Article III, § 28 of the Texas Constitution. Joaquin Avila, associate counsel for MALDEF, advised the Board that use of qualified elector data as a basis for apportionment of the Senate would be retrogressive. The LRB used only total population data in apportioning the State of Texas into representative and senatorial districts. See note 11, *supra.*

(iv) DISTRICT 21: Senate District 21 was changed twice. S.B. 800 had resulted in a small percent retrogression in hispanic population, and the Hobby Plan attempted to cure this by a swap of counties. Then, George Korbel, on behalf of Texas Rural Legal Aid, advised the LRB that in his view District 21 was still retrogressive. In response, the LRB again amended the Senate plan with regard to District 21.

(v) Similarly, the district in Harris County and the Travis County district were amended before the LRB to meet concerns voiced by MALDEF and Mr. Korbel of TRLA.

27. Following is a summary of some of the major proposals considered and, in most cases, adopted by the LRB for the House plan:

(i) BEXAR COUNTY: The Clayton Plan for Bexar County was based upon H.B. 960. However, this plan passed committee by a 10–9 vote, and not a single minority representative on the Committee—there were 2 hispanics and 3 blacks—voted in favor of the plan. Before the LRB, George Korbel of TRLA testified that the Clayton Plan violated the Voting Rights Act because it diluted hispanic voting strength. Bexar County representatives Madla and Tejeda also opposed the Clayton Plan, and supported the Armstrong amendment as being more responsive to minority voting strength. The Armstrong amendment was adopted.

(ii) DALLAS COUNTY: Both George Korbel and David Richards testified that the Clayton Plan—which was based on H.B. 960, and which reduced the percentage of black population in District 100 and increased the hispanic percentage—was retrogressive of black voting strength and would violate the Voting Rights Act because it would eliminate the black incumbent (Sam Hudson) in District 100. They supported a plan proposed by black Representative Paul Ragsdale, which was presented to the LRB as the Armstrong amendment. The Armstrong amendment was adopted.

(iii) HARRIS COUNTY: The Clayton Plan, which was based upon H.B. 960, was opposed by minorities, including black Representative Craig Washington (who participated in drawing alternative plans for Harris County). Again, George Korbel testified that the Clayton Plan would violate the Voting Rights Act—and he and the minority Representatives supported the Armstrong amendment, which was subsequently adopted.

(iv) HIDALGO COUNTY: An hispanic, A. C. (Tony) Garcia, submitted a plan concerning House districts in Hidalgo County, which was adopted by the LRB.

Not every minority proposal was accepted by the LRB. One example involves House District 68 in Southwest Texas. The LRB plan reduced the percentage of hispanic population in this district from 70.2% to 68.3%. George Korbel of TRLA testified that this was possibly objectionable under the Voting Rights Act. David Richards agreed, although he testified the *only* possible problem with the LRB plan was the potential Voting Rights Act problem with District 68. The Justice Department originally objected to District 68 but, as discussed above, withdrew this objection.

### 2. Taint?

In electing to base our temporary court-ordered plans on the LRB plans, we are not unmindful that they are the subject of outstanding objections under the Voting Rights Act. However, the Department of Justice's most recent letter specifically notes that, with the exception of the House districts in El Paso, Bexar and Dallas Counties, and the Senate Districts in Bexar and Harris Counties, the State had met its burden under Section 5 with respect to the LRB plans. We conclude, therefore, that any taint (see Powell, J., concurring in *Wise v. Lipscomb*, 437 U.S. at 549, 98 S.Ct. at 2501) which exists with respect to the legislative judgment embodied in the LRB plans exists only with respect to those portions of the plans as to which objections continue. The Department of Justice appears to share our view with respect to the ongoing vitality of the legislative judgment embodied in those portions of the LRB plans that are not the subject of continuing Section 5 objections. See Part IV D of this opinion, *infra*.

### 3. A Known Quantity

There is another important reason for adhering to the LRB plans to the maximum extent possible. Those plans have been the subject of intense study and public scrutiny for many months. They have been the subject of a six day trial in this Court. All parties to this litigation and this Court know vastly more about the LRB plans and their effects than any of us can know about the other plans, modifications to plans and corrections to modifications filed with this Court during the two weeks preceding our March 5 decision. Under these circumstances, elementary caution militates strongly in an emergency in favor of adopting to the greatest extent possible those plans that are best understood by all.

### D. Voting Rights Act Considerations

The effect of the Voting Rights Act on the posture of this case is problematical, to say the least. This Court does not have jurisdiction to decide whether the LRB plans comply from a substantive standpoint with Section 5 of the Voting Rights Act; the only court with jurisdiction to make such a ruling is the District Court for the District of Columbia. *Perkins v. Matthews*, 400 U.S. 379, 400, 91 S.Ct. 431, 442, 27 L.Ed.2d 476 (1971). At the same time, we are told by the portion of the legislative history of the Voting Rights Act quoted in *McDaniel v. Sanchez*, 452 U.S. at 147, 101 S.Ct. at 2235, 68 L.Ed.2d at 739, that in fashioning our plans under exigent circumstances we should follow the appropriate Section 5 standards, including the body of administrative and judicial precedents developed in Section 5 cases. This Court must attempt to devise a plan that has neither a racially discriminatory purpose nor such an effect. *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *Perkins v. Matthews*, 400 U.S. at 385, 91 S.Ct. at 435. There seems to be no case law which directly addresses the question whether in an emergency we may implement a portion of the LRB plans to which an objection has been interposed by the Department of Justice.

 In answering the question whether and under what circumstances we may implement on a temporary basis a portion of a legislative plan which is the subject of an outstanding Voting Rights Act objection, we turn to the principles developed by the courts, including the Supreme Court, applicable to emergencies. In those situations courts are bound to apply equitable considerations and in awarding or withholding immediate relief, a court can and should consider the proximity of a forthcoming election and the mechanics and complexities of the State's election laws. *Mahan v. Howell*, 410 U.S. 315, 332, 93 S.Ct. 979, 988, 35 L.Ed.2d 320 (1973); *Reynolds v. Sims*, 377 U.S. at 585, 84 S.Ct. at 1393 (1964). With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable demands on a State in adjusting to the requirements of the court's decree. *Reynolds*

*v. Sims,* 377 U.S. at 585, 84 S.Ct. at 1393. Also in an emergency, a district court may adopt as an interim measure a redistricting plan that otherwise may not comply with the stringent requirements for a permanent court ordered plan, *Chapman v. Meier,* 420 U.S. at 19–20, 95 S.Ct. at 762; *Connor v. Williams,* 404 U.S. 549, 550, 92 S.Ct. 656, 657, 30 L.Ed.2d 704 (1972); *Corder v. Kirksey,* 639 F.2d 1191, 1195 (5th Cir. 1981); *Graves v. Barnes,* 408 F.Supp. at 1054. Finally, in emergencies, courts have permitted elections to proceed on the basis of enacted plans or existing districts even when the plans in question were themselves unconstitutional. *E.g., White v. Weiser,* 412 U.S. at 783, 93 S.Ct. at 2348; *Ely v. Klahr,* 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971); *Kilgarlin v. Hill,* 386 U.S. at 121, 87 S.Ct. at 821. We think that the same principle should be applicable to a plan as to which a Section 5 objection has been raised: in emergencies, a court should be permitted to proceed on the basis of such a plan or portions of such a plan if that is the only fair and equitable alternative to disruption of the election process. *E.g., Graves v. Barnes,* 408 F.Supp. at 1054 n.8.

Our position is, we believe, firmly supported by the portion of the Supreme Court's opinion in *Reynolds v. Sims* dealing with remedies:

> Remedial techniques in this new and developing area of the law will probably often differ with the circumstances of the challenged apportionment and a variety of local conditions. It is enough to say now that, once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as *where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment* scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the *proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.* With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. As stated by Mr. Justice Douglas, concurring in *Baker v. Carr,* "any relief accorded can be fashioned in the light of well-known principles of equity . . . .

> We find, therefore, that the action taken by the District Court in this case, in ordering into effect a reapportionment of both houses of the Alabama Legislature for purposes of the 1962 primary and general elections, *by using the best parts of the two proposed plans which it had found, as a whole, to be invalid,* was an appropriate and well-considered exercise of judicial power. Admittedly, the lower court's ordered plan was intended only as a temporary and provisional measure and the District Court correctly indicated that the plan was invalid as a permanent apportionment. In retaining jurisdiction while deferring a hearing on the issuance of a final injunction in order to give the provisionally reapportioned legislature an opportunity to act effectively, the court below proceeded in a proper fashion.

377 U.S. at 585–87, 84 S.Ct. at 1393–94 (emphasis added). *Cf., Ely v. Klahr,* 403 U.S. at 114–15, 91 S.Ct. at 1806–07 (district court's use on a temporary basis of a constitutionally invalid plan upheld where one substitute presented to the court (which could "very likely [result in] a valid reapportionment plan") could not be implemented to hold the imminent elections on time and other feasible substitute was also unconstitutional and was the greater of two evils).

No judicial decision addresses the use of a partially unprecleared plan as a temporary, emergency court-ordered plan. The question of the use of unprecleared plans has arisen in the context of whether a legislative plan must initially be submitted for preclearance, *e.g., McDaniel v. Sanchez, supra; Berry v. Doles*, 438 U.S. 190, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978), not in the context of whether portions of a plan which have been submitted for preclearance and have been objected to can be temporarily utilized upon a district court's finding that parts of the objected to plan are the most equitable under the circumstances.

In *Perkins v. Matthews*, 400 U.S. at 396–97, 91 S.Ct. at 440–41, the Supreme Court refused to order new elections even though elections had been conducted under a plan that had not been precleared. The Court went on to explain:

> In certain circumstances, for example, it might be appropriate to enter an order affording local officials an opportunity to seek federal approval and ordering a new election only if local officials fail to do so or if the required federal approval is not forthcoming. Since the District Court is more familiar with the nuances of the local situation than are we, and has heard the evidence in this case, we think the question of the appropriate remedy is for that court to determine, in the first instance, after hearing the views of both parties.

In *Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973), the Supreme Court permitted elections to take place under a statewide apportionment plan to which an objection had been interposed. In *Horry County v. United States*, the District Court for the District of Columbia stated in dicta that

> [t]he Supreme Court has recognized the equitable power of the District Courts to permit enforcement of such [apportionment] statutes *pendente lite* notwithstanding Section 5. *Georgia v. United States*, 411 U.S. 526, 541, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Perkins v. Matthews*,

400 U.S. 379, 396–397, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971).

449 F.Supp. 990, 996 (D.D.C.1978).

Thus, based upon *Perkins v. Matthews* and *Georgia v. United States*, the grant of equitable temporary relief by this Court through the use of districts that are the subject of Section 5 objections is not *per se* contrary to the prohibitions of Section 5. As emphasized in *Georgia*, it is equitable considerations which determine what *temporary* plan should be utilized.

In devising our temporary plans for the reapportionment of the Texas Senate and House, we have been governed by the foregoing principles. We have elected to honor the valid and unchallenged portions of the legislative judgment. With respect to each district which is the subject of an unresolved objection under Section 5, we have treated the objection as a "given" (since we are precluded from passing on its validity) and we have considered alternatives presented by the parties from the standpoint of fairness, equity and feasibility. The Department of Justice, in a letter to the Secretary of State dated February 23, 1982, appears to concur to a significant extent in our view of our role. The letter says, in relevant part, that this Court "should attempt to effectuate the legislative judgment and modify the [l]egislature's plans only as necessary to meet the concerns raised in the objection letters." To that description of our role, we would add only two caveats. We have attempted to meet the Department of Justice's objections first, where it was possible to do so on the basis of the plans submitted to us without disrupting the election process; and second, where those plans did not, in the guise of remedying the Department of Justice's objections, go far beyond those objections and thereby frustrate the valid portions of the legislative judgment embodied in the LRB plans, a judgment which the Department of Justice agrees we should honor. But whether we have met an objection or whether we have declined to meet an objection for the reasons indicated, our action should not be construed as an expression of

opinion on the validity of that objection. We have no jurisdiction to pass on the Department of Justice's objections, and insofar as we are concerned, their validity is entirely an open question.

The Plaintiffs and MALDEF Intervenors argue that the existence of a Voting Rights Act objection to the LRB plans precludes this Court from ordering into effect on a temporary basis even those portions of the LRB plans that are not objected to, a position which even the Department of Justice rejects. Alternatively they argue that we are precluded from even considering, let alone ordering into effect, any portion of the LRB plans which is the subject of such an objection. This position effectively limits this Court in exigent circumstances to selecting from among the alternatives put forward by the Plaintiffs and MALDEF, whatever their flaws may be. We do not believe that Congress intended our discretion to be so limited. We believe that, with respect to any district that has been objected to, we are required to evaluate the LRB plan and the alternatives put forward by the parties under the equitable principles

applicable to emergency plans and under the standards of Section 5.

Finally, we note that none of the alternative plans proposed has been precleared. The Department of Justice has expressly so stated.[28] We are thus faced with a Hobson's choice—which unprecleared plans are we to use? The answer, as stated by the Supreme Court, is the most equitable of the ones available to us. *Reynolds v. Sims*, 377 U.S. at 587, 84 S.Ct. at 1394. This we have tried to do.

## V. This Court's Temporary Plans

 Applying the above principles, this Court is able to and does hereby adopt the changes to the LRB House plans for Bexar and El Paso Counties filed by MALDEF on February 19, 1982. In all other respects, this Court adopts the LRB Senate and House plans.

### A. Background Information—Statewide

The existing Senate apportionment plan for the State as a whole provides for one district of 35–49.9% black population;[29] one

28. While the representative of the Justice Department stated on March 2, 1982, in open court, that certain plans were acceptable, the Department of Justice declined, in its letter received on March 5, 1982, to give those alternate plans official approval.

As you may be aware during the course of the proceedings in *Terras [sic] v. Clements, supra*, we advised the Court at its request, of our preliminary view that some of the proposals advanced by the parties to that lawsuit appeared to address in a positive way certain of the concerns we continue to have with the House districts in Bexar, Dallas and El Paso Counties and the Senate districts in Bexar and Harris Counties. Whether or not any of these proposals would meet the preclearance requirements under Section 5 cannot, of course, be determined prior to its submission and a full analysis of the information provided for our review.

Considering the review undertaken by the Voting Rights Section of the Department of Justice in its consideration of plans submitted for normal preclearance, it is not surprising that the Department of Justice declines to give official approval to plans not even officially submitted. To the extent that the representative of the Department of Justice did, on March 2, amplify the position of the Department of Justice as to the various plans, we find guid-

ance in our attempt to follow the standards of the Voting Rights Act.

29. We recognize that an analysis of the existing apportionment plans, the LRB plans and the various alternative plans submitted by parties on the basis of voting age population, rather than total population, would be more meaningful for our purposes. However, the voting age population information in the record was not available until a few days before the entry of this Court's March 5 Summary Opinion and Order. It was available only on computer tapes in the possession of the Secretary of State. The original processing of those tapes (and consequently the original information presented to this Court and the parties) contained errors according to the Secretary of State's own admission. The revised information was presented to this Court and the parties shortly before we rendered our decision. While we have considered the revised voting age population information so presented, we are not confident that that information has had the same intensive level of scrutiny by the parties that the total population information has had and we are accordingly not entirely confident of its accuracy. For purposes of this opinion, we have elected to describe the existing apportionment schemes, the LRB plans and

of 65%+ hispanic population; three of 50–64.9% hispanic population; and two of 35–49.9% hispanic population. Looking at the combined black and hispanic population, the existing Senate plan provides for two districts of 65%+ combined black and hispanic population; six of 50–64.9% combined black and hispanic population; and three of 35–49.9% combined black and hispanic population.

The LRB Senate plan provides for one district of 50–64.9% black population; one of 35–49.9% black population; one of 65%+ hispanic population; four of 50–64.9% hispanic population; and one of 35–49.9% hispanic population. Looking at the combined black and hispanic population, the LRB Senate plan provides for four districts of 65%+ combined black and hispanic population; four of 50–64.9% combined black and hispanic population; and two of 35–49.9% combined black and hispanic population.

The existing House apportionment plan provides for four districts of 65%+ black population; seven of 50–64.9% black population; three of 35–49.9% black population; 16 of 65%+ hispanic population; five of 50–64.9% hispanic population; and eight of 35–49.9% hispanic population. Looking at the combined black and hispanic population, the existing House apportionment plan provides for 32 districts of 65%+ combined black and hispanic population; six of 50–64.9% combined black and hispanic population; and 19 of 35–49.9% combined black and hispanic population.

The LRB House plan provides for six districts of 65%+ black population; three of 50–64.9% black population; four of 35–49.9% black population; 16 of 65%+ hispanic population; six of 50–64.9% hispanic population and five of 35–49.9% hispanic population. Looking at the combined black and hispanic population, the LRB House plan provides for 29 districts of 65%+ combined black and hispanic population; six districts of 50–64.9% combined black and hispanic population; and 15 districts of 35–49.9% combined black and hispanic population.

the various alternatives submitted to us in terms of total population (and in some cases

## B. Changes in LRB Plans

### 1. Bexar County—House of Representatives

The existing House apportionment plan for Bexar County provided for one district of 35–49.9% black population; four of 65%+ hispanic population; two of 50–64.9% hispanic population; and three of 35–49.9% hispanic population. Looking at the combined black and hispanic population, the existing House apportionment plan provides for six districts of 65%+ combined black and hispanic population; one of 50–64.9% combined black and hispanic population; and two of 35–49.9% combined black and hispanic population.

The problem in Bexar County with which the Texas legislature, the LRB and all parties to this litigation have had to cope is that Bexar County did not grow as rapidly during the 1970's as did the balance of the State, and as a result Bexar County lost one House seat in 1980. In addition, the existing inner city districts, containing large hispanic populations, were substantially underpopulated vis-a-vis the ideal House district, while the outer districts, in many cases primarily anglo, were overpopulated.

The LRB House plan provided for one district of 35–49.9% black population; four of 65%+ hispanic population; one of 50–64.9% hispanic population; and one of 35–49.9% hispanic population. Looking at the combined black and hispanic population, the LRB House plan provides for five districts of 65%+ combined black and hispanic population; one of 50–64.9% combined black and hispanic population; and one of 35–49.9% combined black and hispanic population.

The Department of Justice's letter of objection stated that: "It is ... alleged that the odd [shape] of proposed [district] 117 in Bexar County [serves] to dilute the voting strength of the minority communities in [Bexar County]." At the hearing on March 2, 1982, the Department of Justice's represent. ...

registered voter information) rather than in terms of voting age population.

sentative took the position that all three plans submitted for Bexar County—by MALDEF, by the House Plaintiffs and by Speaker Clayton (his A plan)—addressed the Department of Justice's objections.

Testimony at the hearing on March 1, 1982, from the County Clerk of Bexar County indicated that Bexar County could hold the elections on time under the LRB plan and all three modifications, so that feasibility is not a factor in deciding among the four plans under consideration.

In the opinion of this Court, the MALDEF proposal is superior to the LRB plan for purposes of an interim plan (pending resolution by the Texas legislature of the validity of the Department of Justice's objection) because it creates one more 65% + combined black and hispanic district (for a total of seven 50% + combined black and hispanic districts), thereby appearing to resolve the Department of Justice's objection. The House Plaintiffs' proposal creates only six 50% + combined black and hispanic districts (one less than MALDEF), and it does so by creating two districts with a combined black and hispanic population of over 80% and two districts with a combined black and hispanic population of over 74%. Extensive testimony at trial, which this Court credits, establishes that in Bexar County the high level of political organization and activity in the hispanic community makes it unnecessary to provide minority population concentrations of that size in order to assure that the minority population can elect a candidate of its choice. In view of this fact, minority concentrations of 74% + and 80% + in Bexar County constitute packing and reduce the number of districts where minorities can elect a candidate of their choice.

The Clayton A plan similarly fails in our view because it creates only six 50% + combined black and hispanic districts, and several of those districts may also constitute packing.

### 2. El Paso County—House of Representatives

The existing House apportionment plan for El Paso County provided for one district

of 65% + registered hispanic voters, one of 50–64.9% registered hispanic voters and one of 35–49.9% registered hispanic voters.

The LRB House plan provided for two districts of 50–64.9% registered hispanic voters and one district of 35–49.9% registered hispanic voters.

The Department of Justice's letter of objection stated that:

... it has been alleged that the house plan also adversely affects the minority populations in ... El Paso [County]. . . . Regarding El Paso County, we have received allegations that the proposed plan does not fairly reflect the voting strength of the Mexican-American community, which has increased significantly over the past ten years.

At the hearing on March 2, 1982, the Department of Justice's representative took the position that the MALDEF plan and Speaker Clayton's A plan address the Department of Justice's concerns.

Testimony from the County Clerk of El Paso indicated that the elections could be held on time under any plan selected by this Court, so that, as in Bexar County, feasibility is not a factor in deciding among the three plans under consideration.

The MALDEF plan, unlike either the LRB plan or the Clayton A plan, creates three districts having an hispanic registered voter population of 50% +. At the same time the MALDEF plan recognizes the natural barrier of the Franklin Mountain, a matter of great concern to the residents of El Paso throughout the entire reapportionment process. Extensive testimony at trial, which this Court credits, establishes that, among other statistics, it is important to consider statistics reflecting voter registration in an area such as El Paso where resident aliens, who are not eligible to vote, and persons who are too young to vote compose a significant portion of the hispanic population. Because the MALDEF plan best reflects hispanic voting strength in El Paso, it is preferable to either the LRB plan

or the Clayton A plan for purposes of an interim plan pending resolution by the Texas legislature of the validity of the Department of Justice's objection.

### C. Reasons for Rejection of Certain Proposals

We have rejected proposed modifications to the LRB plans in certain areas for the reasons indicated below. Once again, this rejection is not a determination that the Department of Justice's objections are invalid. This, too, remains to be resolved between the Texas legislature and the Department.

### 1. Harris County—Senate

The existing Senate apportionment plan for Harris County provided for one district of 50–64.9% combined black and hispanic population and three districts of 35–49.9% combined black and hispanic population.

The LRB Senate plan provided for one district of 50–64.9% black population and two additional districts of 35–49.9% combined black and hispanic population.

The Department of Justice's letter of objection stated that:

> Regarding Harris County, we have received allegations that the senate districts unnecessarily fragment the minority community and the odd configurations of proposed Districts 6 and 13 lend support to that claim and raise substantial question as to whether the plan, as it affects Harris County, satisfies the requirements of Section 5.
>
> Additionally, we have received allegations that the state used criteria for drawing senate districts in Harris County which differ from the criteria used in drawing senate districts in Dallas County. The claim is that in Harris County the state divided the minority communities among several districts so as to create districts in which minorities could have an "impact" even if they could not elect candidates of their choice. In Dallas County, the minority community apparently was treated as a "community of interest" and the plan seems to recognize

the potential of that community to elect candidates of their choice to the senate. The state has presented no informction to demonstrate why such divergent criteria were employed or to establish that the use of the seemingly inconsistent criteria does not have a discriminatory effect.

At the hearing on March 2, 1982, the Department of Justice's representative reiterated the concern relating to fragmentatior. of the minority community as evidenced by the "rather sweeping nature of District 6 and—the shape of Districts 6 and 13 . . . ."

The MALDEF plan, as modified on March 2, 1982, to conform to precinct lines, provided for one 35–49.9% black district; and one district of 35–49.9% hispanic population. Looking at the combined black and hispanic population, the MALDEF plan provided for one district of 65%+ combined black and hispanic population and one district of 50–64.9% combined black and hispanic population.

The Senate Plaintiffs' plan, as modified on March 1, 1982 (the so-called "Weekend Compromise"), created one 50–64.9% black district; one 35–49.9% hispanic district; and two 65%+ combined black and hispanic districts.

At the hearing on March 2, 1982, the Department of Justice's representative took the position that the Senate Plaintiffs' plan adequately addressed the fragmentation problem. With respect to the MALDEF plan, he stated that it adequately addressed the Section 5 problem, but noted "some concern that District 13 with a 49 per cent Black population does not create a Black population majority whereas the Senate Plaintiffs' Plan does have one . . . ." This concern is a significant one to this Court as well, in view of the fact that Harris County has a black population of 473,698.

The overriding consideration in Harris County is holding the election on time. This Court was presented with numerous affidavits and heard lengthy, detailed testimony from the County Clerk of Harris County to the effect that even if the LRB plans were adopted intact for Harris Coun-

ty, it would not be possible to hold the primaries, or, indeed, any other election in Harris County before May 12. After an intensive evening conference between representatives of the Secretary of State and the Texas Attorney General, the Harris County Clerk and her counsel and others, the parties advised this Court of numerous changes in the election procedures which had been worked out which in all probability would make it possible to hold the election on May 1 if this Court ruled no later than March 5. An agreed Order entered by this Court on March 5, 1982, effects the necessary changes in the statutory requirements for Harris County (and other changes applicable to all counties in the State).[30] While the County Clerk did, on re-cross, make the statement that any of the plans for Harris County before this Court which conformed to precinct lines could be implemented by May 1, her testimony was conflicting and in view of her entire testimony, this Court has concluded that adopting in Harris County any plan making changes from the LRB plans would seriously jeopardize the County's ability to hold the election on time. Both the MALDEF Senate plan and the Senate Plaintiffs' plan for Harris County embody extensive changes in district lines from the LRB Senate plan and would, under the evidence, render a timely election in Harris County impossible. They are rejected for that reason.

### 2. Bexar County—Senate

The existing Senate apportionment plan for Bexar County provided for two districts of 50–64.9% hispanic population; one of 35–49.9% hispanic population; and three of 50–64.9% combined black and hispanic population.

The underpopulation in the inner city hispanic areas referred to above as a problem in the apportionment of the Bexar County House districts was also a problem in the apportionment of the Bexar County Senate districts.

The LRB Senate plan provided for two districts of 50–64.9% hispanic population and one of 35–49.9% hispanic population. Looking at the combined black and hispanic population, the LRB plan provided three districts of 50–64.9% combined population.

The Department of Justice's letter of objection stated that:

[I]n Bexar County, existing District 19 is underpopulated according to the 1980 Census and thus requires additional persons to meet one person-one vote standards. The proposed plan for this area, however, removes a substantial number of Mexican Americans from this district and adds a larger number of Anglos. The effect of this method of drawing the boundaries for proposed District 19 appears to be a dilution of Mexican-American voting strength.

At the hearing on March 2, 1982, the Department of Justice's representative indicated that the Department was primarily concerned with the effect of the removal of one census tract, 1604, from district 19 to district 26. Later in his statement, he indicated that a resolution of the Department's objection might require the moving of "four or five" unspecified census tracts.

This Court has decided to adopt the LRB Senate plan for Bexar County rather than the MALDEF plan or the Senate Plaintiffs' plan. First, we note that both the MALDEF plan and the Senate Plaintiffs' plan go far beyond meeting what is essentially a limited objection of the Department of Justice. The Department's representative stated at the March 2 hearing that those plans "did extensive reworking of the lines in Bexar County" and that "[w]e did not feel that the reinvention of the wheel was absolutely necessary in this type of situation, that a modification along that common boundary between 19 and 26 in order to possibly increase the Mexican-American population in District 26 . . . would approach the point where the Mexican-American population in 26 would be able to retain their ability to elect candidates of their choice."

**30.** See note 10, *supra.*

Although the MALDEF plan does create two districts of 50–64.9% hispanic population and one district of 35–49.9% hispanic population, it does so by placing a large area of Northern Bexar County in a district (no. 25) that runs the entire distance to El Paso. That is the proverbial "uncouth" district and, in our view, is unjustified in a temporary court-ordered plan.

The Senate Plaintiffs, on the other hand, create two districts with a 77.58% and 70.48% hispanic population, respectively, with the result that the third district in the Bexar County area drops to only 23.69% combined black and hispanic population. The Department's representative expressed a concern that the Senate Plaintiffs' plan "may in fact result in an over concentration in District 26 and 21." In view of the extensive testimony about the high level of political organization and activism that exists in Bexar County, as described above, and our conclusion that districts with a minority population of more than 70% are not necessary in Bexar County in order to insure that the minority population will be able to elect candidates of their choice, we have concluded that the Senate Plaintiffs' plan for Bexar County constitutes packing and dilutes the impact of minorities on the political process. We reject it for that reason.

### 3. Dallas County—House of Representatives

The existing House apportionment plan for Dallas County provided for one district of 65%+ black population; and three of 50–64.9% black population. Looking at the combined black and hispanic population, the existing plan provides for four districts of 65%+ combined black and hispanic population; and two districts of 50–64.9% combined black and hispanic population.

The geographic dispersal of the black population in the City of Dallas created severely malapportioned minority districts; during the decade of the 1970's the City of Dallas lost the population equivalent of one black representative district. The LRB attempted to maintain and enhance the mi-

nority voting strength in Dallas while rectifying the problem of underpopulation in the urban minority districts. In addition, to the extent feasible, the LRB attempted to maintain existing constituent-representative relations.

The LRB House plan for Dallas County provided for three districts of 65%+ black population; and one district of 35–49.9% hispanic population. Looking at the combined black and hispanic population, the LRB plan provided for three districts of 65%+ combined black and hispanic population; and two of 50–64.9% combined black and hispanic population.

The Department of Justice's letter of objection stated that:

> [W]e have received allegations that in Dallas County the state's plan fragments the Mexican-American community on the west side of the City of Dallas in such a manner as to prevent the creation of a district where Mexican-Americans could elect a candidate of their choice. In addition, the sweep of proposed District 100 through the center of the City of Dallas is alleged to dilute the voting strength of Dallas' black community; the contention is that the use of more compactly drawn districts would result in the creation of an additional district in which black voters would be able to elect a candidate of their choice.

At the hearing on March 2, 1982, the Department of Justice's representative conceded that, after talking with all the parties and reviewing the plans before this Court, it was virtually impossible to "confine the changes that would address the [Department of Justice's] concern without redrawing the entire county." The Department's representative stated that the House Plaintiff's plan, MALDEF's plan and Speaker Clayton's A plan all appear to address the objections voiced.

The House Plaintiffs' plan provided for three districts of 65%+ black population; one of 35–49.9% black population; one of 35–49.9% hispanic population; and five of 65%+ combined black and hispanic population.

The MALDEF plan provided for one district of 65%+ black population; two of 50–64.9% black population; one of 35–49.9% black population; one of 35–49.9% hispanic population; four of 65%+ combined black and hispanic population; and one of 50–64.9% combined black and hispanic population.

The Clayton A plan provided for one district of 65%+ black population; three of 50–64.9% black population; one of 35–49.9% hispanic population; four of 65%+ combined black and hispanic population; and one of 50–64.9% combined black and hispanic population.

All the alternatives to the LRB plan presented to this Court address the problems raised by the Department of Justice, but each has problems of its own. For example, the House Plaintiffs' plan reduces District 100, which has elected a black representative since 1972, from a majority black district to a district that is only 25% black. However, we pretermit any discussion of those problems because our overriding concern with avoidance of disruption of the election process prevents us from adopting any reapportionment plan for the Dallas House districts other than the LRB plan.

As the Department of Justice's representative recognized, all three plans involve a substantial number of changes in the Dallas County House district lines from those adopted by the LRB House plan. The precinct lines in Dallas County have been drawn on the basis of the LRB plan. A representative of the County Clerk's office testified that the in-person voting could take place on May 1 if a moderate number of changes only were made in district lines; but the representative further testified that any changes in district lines from the LRB plan would preclude absentee balloting. No solution to the problem of absentee balloting was proffered by the parties. Based upon all the evidence, this Court finds that the election in Dallas County could not be properly and timely held under any of the alternative plans. This Court has weighed the relative increase in minority voting strength that would occur upon adoption of the alternative plans with the detrimental effects to minorities and others that would occur if the election were postponed, and this Court is of the opinion that the election should proceed in Dallas County under the LRB's House plan.

### 4. De Minimis Plans

The House Plaintiffs, MALDEF and Bill Clayton, Speaker of the House of Representatives, have presented low deviation or de minimis plans that disregard the LRB House plan and reapportion the entire state.[31] They argue that a court-ordered plan is held to higher standards than a legislative plan, citing *Chapman v. Meier*, 420 U.S. at 26, 95 S.Ct. at 765. Whether the 9.95% deviation in the LRB House plan is objectionable under the *Chapman* standard is not an issue that we must decide at

---

**31.** We note that the *de minimis* plan submitted by the House Plaintiffs, while reducing the total maximum deviation of House districts from 9.95% (as results from the LRB House plan) to 4.83%, splits 31 counties, as compared to 17 counties in the LRB House plan. The House Plaintiffs' plan splits almost the same number of counties and even splits many of the same counties found unconstitutional by the Supreme Court of Texas in *Clements v. Valles, supra.* The State's firmly established policy against dividing county lines, which has found its most recent expression in *Clements v. Valles,* was recognized by the Supreme Court in *White v. Regester,* 412 U.S. at 765 n.8, 93 S.Ct. at 2339 n.8. The total maximum deviation in the LRB House plan stems from the decisions to keep Gregg County intact (see *Clements v. Valles,* 620 S.W.2d at 114–15)

which results in a deviation of +4.99%, and to avoid splitting small rural counties, which results in a deviation of ±4.96%. The ratio between the largest district and the smallest district under the LRB House plan is 1.10 to 1.

The *de minimis* plans presented by the House Plaintiffs, MALDEF and Bill Clayton are addressed to what they perceive to be the requirements for permanent *court-ordered* plans under *Chapman v. Meier,* 420 U.S. at 26, 95 S.Ct. at 765. In the event that the LRB House plan is adopted by the Texas legislature in 1983 and again challenged in this Court under the fourteenth amendment as violative of the one person, one vote requirement of *Reynolds v. Sims, supra,* and its progeny, it will be judged by the standards applicable to legislative plans. *Gaffney v. Cummings, supra,* and *White v. Regester, supra.*

this juncture. To the extent that this deviation requires justification, we find it in the exigencies of the situation, which, simply put, do not permit us to reapportion the entire State if the primaries are to be held on May 1. *Graves v. Barnes*, 408 F.Supp. at 1050.

### D. Summary

To summarize, we reiterate what we have not done. We have not passed upon the constitutionality of the LRB plans or the validity of the Section 5 objections. As explained above, we believe that we are foreclosed from doing so. Likewise, while we have repeatedly disclaimed any intent to adopt permanent plans at the present time, we must consider the real possibility (according to all parties) that the temporary plans we have adopted may, in whole or in part, become the plans adopted by the Texas legislature in 1983. Since the plans so adopted will then be required to be submitted for Section 5 preclearance, we decline to rule on their validity under the Voting Rights Act. See *Perkins v. Matthews*, 400 U.S. at 385, 91 S.Ct. at 435. We defer to the "primary jurisdiction" of the Department of Justice, S.Rep. 94–245, *supra*, to preclear these plans should they become expressions of legislative policy.[32]

We have considered the proximity of the forthcoming primaries and the mechanics and complexities of the State's election laws and processes, and we have endeavored to avoid a disruption of the electoral process, an event which would materially adversely affect racial and language minorities. We have attempted to adhere to the legislative configurations to the maximum extent possible. We have treated the remaining Section 5 objections by the Department of Justice as "givens" and have addressed those objections and, where possible, remediated them. To the degree that the Department of Justice's objections have been addressed by plans which do not delay the elections and which do not unnecessarily distort the legislative judgment, we have adopted those plans, relying on the informal approval[33] of those plans by the Department of Justice's representative. We think that the plans which we have adopted are the best of the viable alternatives presented to us and are racially fair and equitable to the people of this State and that they comply in all respects with the principles applicable to temporary, court-ordered plans.

### VI. The Future

The temporary plans adopted by this Court will remain in effect for all elections through December 31, 1983, unless valid reapportionment plans are sooner enacted. In the event that valid plans are not in effect by September 1, 1983, or such earlier date as this Court may hereafter establish, this Court will then proceed to draw permanent court-ordered plans for the apportionment of the Texas legislature. These proceedings have demonstrated that the procedures employed in this case to date, while they may have been the only procedures available to this Court under the circumstances, are not the most satisfactory way for a court to adopt a permanent redistricting plan. This Court will, therefore, consider various alternatives, including the appointment of a special master to conduct evidentiary hearings and to recommend redistricting plans to this Court.

We recognize, and we assume that all parties recognize, that if this Court is required to adopt permanent court-ordered plans for the apportionment of the Texas legislature, we will be governed by the stricter standards applicable to such plans. Because we lack the political authoritativeness that the Texas legislature can bring to the task of redistricting, we will be unable to be responsive to the goals and concerns of many of the parties to this litigation. This Court cannot mandate racial or political proportional representation. *See City of Mobile v. Bolden*, 446 U.S. 55, 78, 100

---

**32.** We note that the portions of the MALDEF plan which we have adopted for interim use have not been submitted to the Department of Justice for preclearance.

**33.** See note 28, *supra.*

S.Ct. 1490, 1506, 64 L.Ed.2d 47 (1980); *United Jewish Organizations v. Carey*, 430 U.S. 144, 166–67, 97 S.Ct. 996, 1010–11, 51 L.Ed.2d 229 (1977); *White v. Regester*, 412 U.S. at 765–66, 93 S.Ct. at 2339–40; *Whitcomb v. Chavis*, 403 U.S. at 149–50, 153–54, 156–57, 91 S.Ct. at 1872, 1873–74, 1875–76; *WMCA, Inc. v. Lomenzo*, 382 U.S. 4, 86 S.Ct. 24, 15 L.Ed.2d 2 *aff'g* 238 F.Supp. 916 (S.D.N.Y.1965). This Court cannot assure legislative districts composed of socio-economic communities of interest. *See Reynolds v. Sims*, 377 U.S. at 562, 84 S.Ct. at 1381 ("Legislators are elected by voters, not farms or cities or economic interests."). Nor can this Court assure maintenance of existing constituent representative relations. Such matters are legitimate legislative concerns, to be addressed to the Texas legislature in 1983, but of only secondary interest to this Court; the principal goals of a permanent court-ordered plan are substantial voter equality and racial fairness. *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1162–63 (5th Cir. 1981).

This Court's Order of January 28, 1982, recommended that the Texas legislature consider the adoption of some procedure by which negotiations could take place between the State and the Department of Justice and, if necessary, agreed changes in a redistricting plan could be implemented without the necessity of costly, time-consuming litigation in the federal courts. We reurge that recommendation, and we do so *strongly*.

The State of Texas has made a substantial and very responsible effort to reapportion the Texas Senate and House in a manner consistent with the United States Constitution, the Texas Constitution, and the Voting Rights Act. Whether the State has succeeded in doing that is a matter we are precluded from deciding.[34] The State finds itself in the peculiar position of lacking a legal mechanism to address and resolve the Voting Rights Act objections. There is no evidence in this record to suggest that if such a mechanism existed, it would not be diligently used by the State to resolve the remaining objections, whether by providing additional information to the Department of Justice or by making changes in the LRB plans. Indeed, there is ample evidence to suggest the contrary. We see our role, then, as an extremely limited one. Our job is to fill the legal hiatus that exists under Texas law in order to have the 1982 elections held and to permit the State to complete the redistricting process that has been temporarily interrupted. We fill that hiatus in a situation in which there has been *no* adjudication by any court that the LRB plans are in any respect constitutionally infirm and in which the great majority of the Senate and House districts provided for by those plans have, as a practical matter, been precleared under the Voting Rights Act. Finding ourselves in that situation and lacking the political authoritativeness of the Texas legislature, we have honored the Voting Rights Act by deferring to the Department of Justice's objections where it was possible to do so without frustrating the ongoing electoral process or intruding unnecessarily upon valid portions of the legislative judgment.

This Court retains jurisdiction in this litigation.

---

34. This Court recognizes that the magnitude of the effort made by the Texas legislature and the LRB in connection with the redistricting process is not dispositive of the question whether either group acted with invidious intent to discriminate against minorities. The existence or non-existence of invidious intent bears on the question of the constitutionality of the LRB plans, a question we appear to be precluded from deciding. See text at p. 525, *supra*. Accordingly we express no opinion on the question of the intent of the legislature or the LRB.